THE AMERICAN METAL COMPANY, LIMITED, PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 31547. Promulgated February 20, 1953.

*John F. Dooling, Jr., Esq.*, and *Robert MacCrate, Esq.*, for the petitioner.

*Conway N. Kitchen, Esq.*, for the respondent.

## OPINION.

MURDOCK, *Judge:* The petitioner argues that the proceeds of mining have been regarded traditionally as being characteristically income and not mere conversions of capital or returns of cost, and the Mexican "Production Taxes have the characteristics of income or profits taxation by reason of their history, their purpose, their effects and their technical characteristics, that is to say, the presence in them of progressive rates of tax of historical correlation with price and presumed profit, of adjustment of rate and incidence to costs and profits as manifested in their scheme of reductions and exemptions, and of directness of burden on the taxpayer as distinguished from susceptibility to shifting of the burden to others." This foreign tax, it says, must be tested by its functional characteristics, its purpose, operation, and ef-

fect and not by the extent to which it mirrors our own scheme of income taxation, if the credit in question is to carry out the policy of avoiding double taxation for which it was intended. It deems the credit proper where the foreign tax has an income base, even though the base is gross income. It cites a number of decisions to show that the proceeds of ores mined are gross income. It concludes that the proceeds of mining are like interest, dividends, and royalties which have always been viewed under our income tax thinking as having no capital content but as being in the nature of the rent, the usufruct, or the issue of the mining interest so that the tax falling upon mining proceeds would be the same as the tax falling on interest, dividends, royalties, or rentals, and would be a tax on income notwithstanding the absence of provisions for deductions. It reasons that the production taxes are not, as stated in I. T. 3945, 1949–1, C. B. 88, merely upon the value of ore produced, and therefore analogous to gross receipts or sales taxes. The production taxes, it claims, are not characterized by the fact that they apply percentages to values but are characterized rather by their profits objective as shown by the expert testimony, the preambles of certain of the decrees, and the articulation of the whole tax scheme with mining profits.

The above, as well as all of the other arguments of the petitioner and of the respondent contained in their briefs, have been carefully considered in the light of the stipulated facts, the testimony of the witnesses, the decisions cited, and the provisions of section 131 in reaching the conclusion that the production taxes may not be regarded as income taxes or taxes in lieu of income taxes within the meaning of section 131 (a) (1) or (h) so as to entitle the petitioner to the credit provided in section 131 (f) (1). The evidence does not all point one way by any means and the difficulties of fully understanding the characteristics and purpose of this foreign tax are obvious. It is not practical to discuss every argument that has been made and the facts marshaled to support it. Nevertheless, some discussion of the petitioner's argument seems appropriate.

The petitioner cites court decisions to show that mining proceeds have always been regarded as gross profits rather than gross receipts and argues that income taxes may be imposed upon gross profits. It may be conceded, at least for the purpose of discussion, that income taxes may be imposed upon gross profits, but the question here is whether, under all of the evidence in this case, the Mexican Production Taxes are to be regarded as income taxes or taxes in lieu of income taxes within the meaning of section 131 (a) (1) or (h).

The petitioner relies upon the preambles to several decrees relating to the production taxes to show that the Mexican Government intended to impose a tax on income through the production taxes. The evidentiary value of the decrees to the petitioner is not undiluted. One

of November 25, 1919, changed the production tax rate on silver ostensibly because an increase in world prices of the metal constituted a source of great unearned profit to producers which the nation could share without burdening the mining industry. Another of December 24, 1920, changed the production tax rate on silver because of a fall in the value of silver forcing some mines out of business and the Government felt it should permit them to obtain some profits. The third, dated April 11, 1935, again changed the rate on silver and recited:

WHEREAS, in the measure that silver reaches a higher price in the world market, the profits of the mining companies become larger and larger, without this additional increase of wealth entailing greater efforts on the part of the operators or an additional investment of capital, since when the silver reaches a price which guarantees productivity of operations and a reasonable margin of sure profits, subsequent increases in the sales price constitute super earnings not in relation to the effort and the capital of the producer;

WHEREAS, the direct ownership of the mineral deposits, established without discussion from Colonial times in favor of the Crown of Castile, and subsequently transferred to the Nation in the form at present expressly consecrated in Article 27 of the Federal Constitution, would not really be such direct ownership, if during the boom times the Nation did not obtain from the mining proceeds its proper share, both through its right of ownership and the authority which said Article 27 confers for "regulating the advantage and use of the natural elements susceptible to appropriation, to permit a fair distribution of the public wealth and to care for its preservation"; and

WHEREAS, the taxes on the production of silver should not be raised any further, while the price of this product does not rise above 77 pesos per kilogram, but, on the other hand, if the prices rise higher, it shall be fully justified to collect a part of the excess by way of taxes, applying them to purposes which might redound to the immediate benefit of the Nation; I considered it advisable to issue the following Decree:

A decree of February 11, 1931, granted some exemptions after reciting that the mining industry represented the main support of the national economy and a decline in that industry would aggravate the depressing exchange situation. Another dated January 1, 1935, provided that the rate of production tax on silver and copper would depend upon the New York prices converted into pesos at current exchange rates. That was done so that the Mexican Government would not suffer loss of taxes due to the decline of the exchange value of the pesos. The fact that the rates of production taxes were lower on refined metals than on virgin ores was to encourage complete processing in Mexico and sheds no particular light on the present question. It is obvious from the decrees, the "progressive rates" and the testimony, that the Mexican Government, in imposing the production taxes, gave some consideration to the profit problems of the miners and the industry, as well as to the share of the value of the metals which the state should have as a result of its ownership of the ores in place, nevertheless, it did not base the production taxes on profits so as to make those taxes income taxes. Real estate taxes might con-

ceivably be reduced during a depression for somewhat similar reasons without thereby indicating that profits were the basis of the tax.

The principal argument of the petitioner is that the production taxes were income taxes and it does not make an extensive separate argument that they were taxes in lieu of income taxes. They were in effect before Mexico imposed any income taxes and they continued to be in effect thereafter without substantial change. It is not apparent that any change was made in the production taxes as a result of the later enactment of the Mexican Income Tax Laws. There is evidence that under one or more of the schedules the income taxes on miners were somewhat less than on other concessionaires of the Government, but that circumstance is not relied upon and is insufficient to show that the production taxes were "taxes in lieu of income taxes" within the meaning of section 131 (h). The record does not justify a finding that the production taxes were ever intended to be or were taxes in lieu of income taxes.

The production taxes for which credit is claimed were imposed and paid during the 24 years from 1924 through 1947. Mexican Income Tax Laws were also in effect during all of those years. The production taxes were in effect prior to that period but the income taxes were not. The production taxes paid by Minera during the 24 years amounted to more than three times the income taxes paid during that same period. Annual deductions, including one for the production taxes but none for depletion, were allowed in computing the net income of Minera for Mexican income tax purposes, but deductions were not granted under the Mexican Production Tax Laws. The Republic of Mexico owned the ore in place, the mining of which gave rise to the production taxes. The miner paid the Government nothing for the minerals mined except as the taxes, particularly the production taxes, might represent such payment. The production taxes were payable when the metals were mined regardless of whether or not they were subsequently sold and regardless of whether or not any profit resulted. Minera did not pay income taxes during at least 9 of the 24 years, due to losses or insufficient income, but it was required to pay production taxes in each of the 24 years. These are some of the circumstances which have led to the conclusion that the production taxes were not income taxes.

The only other question requiring decision is the issue raised by the respondent. He claims that he erred in allowing a credit based upon payments converted into dollars at the rate of exchange prevailing at the times when the taxes were paid. He relies heavily upon the case of *Bon Ami Co.*, 39 B. T. A. 825, but that case is not in point. There, the foreign taxpayer kept its books on the basis of the foreign currency so that the foreign tax paid, the accumulated earnings, and the ultimate dividend were all in terms of foreign currency and there

was no occasion to reduce any of them to United States currency until the dividend was paid and the credit computed. Here the foreign subsidiary kept its books so that tax payments, earnings, and dividends were currently and exclusively reflected in the equivalent of United States currency as opposed to foreign currency, and the "proportionate part" of the foreign tax represented in the dividend can only be determined by reference to the subsidiary's books. The exchange rate at the time the foreign taxes were paid and accounted for was used to translate those payments into United States currency for entry in the books at that time. Thus, the exchange rate at the date of the dividend had no relation to the amount of foreign tax paid, to the accumulated earnings, or to the dividend paid. The whole account of Minera had been stated from start to finish in the equivalent of dollars rather than in the equivalent of Mexican pesos, and no foreign exchange problem arises.

The result of this decision is to leave the parties where we found them on both issues.

Reviewed by the Court.

*Decision will be entered in accordance with the notice of deficiency.*