GUANTANAMO & WESTERN RAILROAD COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59860. Filed January 26, 1959.

██

*Richard E. Garley, Esq.*, and *John J. Hayes, Esq.*, for the petitioner.

*Anthony S. Del Giudice, Esq.*, and *Norman L. Rapkin, Esq.*, for the respondent.

ARUNDELL, *Judge:* The respondent determined deficiencies in income tax for the taxable years ended June 30, 1949, June 30, 1950, and June 30, 1951, in the respective amounts of $35,891.27, $32,354.72, and $44,932.56.

The issues remaining for our decision are:

1. Whether the respondent erred in disallowing deductions for interest expense under the provisions of section 23(b) of the Internal Revenue Code of 1939 of $120,000, $90,000, and $90,000 for the taxable years ended June 30, 1949, 1950, and 1951, respectively.

2. Whether the respondent erred in disallowing deductions for depreciation of bridges and culverts for the taxable years ended June 30, 1950 and 1951, in the amounts of $18,979.41 and $18,980.16, respectively.

3. Whether the respondent erred in disallowing foreign tax credits under the provisions of section 131 of the Internal Revenue Code of 1939 in the amounts of $9,330.61, $7,752.65, and $11,700.26 for the taxable years ended June 30, 1949, 1950, and 1951, respectively.

Two other issues were assigned, one of which was withdrawn by petitioner and one of which was conceded by respondent in his brief. Effect will be given to this concession in the recomputations to be made under Rule 50.

### FINDINGS OF FACT.

Most of the facts were stipulated and they are so found.

Petitioner is a corporation, incorporated on September 25, 1909, under the laws of the State of Maine, with its principal office at Camaguey, Republic of Cuba. It adopted a fiscal accounting period ending June 30 and an accrual basis for accounting purposes. Its principal business activity is the operation of railways solely within Cuba, and related activities incident thereto.

Petitioner filed its United States corporation income tax returns for the fiscal years ended June 30, 1949, 1950, and 1951, with the collector, now district director, of internal revenue at Baltimore, Maryland.

Petitioner commenced business in the Republic of Cuba during the year 1909 and continued to transact all of its business in Cuba under a registration of its charter within the Mercantile Registry of Havana, Cuba, and in the office of the Railroad Commission of the Republic of Cuba as required by the laws of Cuba.

All the property, both real and personal, owned by petitioner during the taxable years ended June 30, 1949, 1950, and 1951, was located in Cuba. Petitioner transacted no business of a commercial character except in Cuba and all of its gross income during the years in issue has been derived from the operation of its railroads and related activities within Cuba.

A controlling interest in petitioner was acquired on November 18, 1948, by Cuba Northern Railways Company, a Cuban corporation. The Consolidated Railways of Cuba, a Cuban corporation, owns all of the stock of Cuba Northern Railways Company. Cuba Northern Railways Company owned the following percentages of outstanding capital stock of petitioner in each of the taxable years involved:

| Class of stock | June 30— | | |
| --- | --- | --- | --- |
| | 1949 | 1950 | 1951 |
| | Per cent | Per cent | Per cent |
| First preferred | 86.6 | 89.7 | 89.7 |
| Second preferred | 76.3 | 76.3 | 81.4 |
| Common | 86.5 | 89.6 | 89.6 |

Petitioner, in its returns filed for the fiscal years in question, claimed the following interest expense deductions on its mortgage indebtedness and the respondent has allowed in part and disallowed in part the claimed expense deductions as follows:

| Fiscal year ended June 30 | Interest claimed by petitioner | Interest allowed by respondent | Interest disallowed by respondent |
| --- | --- | --- | --- |
| 1949 | $150,000 | $30,000 | $120,000 |
| 1950 | 120,000 | 30,000 | 90,000 |
| 1951 | 120,000 | 30,000 | 90,000 |

Effective January 1, 1928, petitioner executed in New York City a first mortgage agreement with the American Exchange Irving Trust Company (now Irving Trust Company), a New York corporation. From that date and during all times material to the proceedings herein, the petitioner's indebtedness was outstanding in the principal amount of $3,000,000, evidenced until July 1, 1952, by petitioner's first mortgage 6 per cent gold bonds, Series A, due January 1, 1958. None of such bonds was at any time material to the proceedings herein owned by petitioner's parent or the parent of its parent. On July 1, 1949, the presenters of interest coupons consisted of persons holding a principal amount of bonds, as follows:

| Classification of persons | Principal amount |
|---|---|
| Abraham & Co., 120 Broadway | $1, 133, 500 |
| Merrill Lynch, Pierce, Fenner & Beane | 977, 000 |
| 159 individuals | 471, 500 |
| 6 estates | 18, 000 |
| 49 miscellaneous persons (banks, corporations, etc.) | 315, 500 |
| Total | 2, 915, 500 |

The record does not show who held the remaining $84,500 principal amount of bonds.

By the express terms of the bonds, the principal, premium, if any, and interest thereon were payable at the office or agency of the petitioner in the Borough of Manhattan, the City of New York, State of New York, United States of America. The interest was payable semiannually on January 1 and July 1.

Section 14 of article Sixth of the said first mortgage agreement deals with remedies in case of default and provides in part that:

no provision contained in this Indenture shall be, or be construed as being in derogation of the laws of the Republic of Cuba relating to mortgages on railroads * * * and each and every action or proceeding taken or thing done by the Trustee in pursuance of any of the provisions of this Indenture shall be taken and done in conformity with such laws, anything herein contained to the contrary notwithstanding.

Section 1 of article Twelfth of the first mortgage agreement also expressly provided, in part, as follows:

Both parties designate the Borough of Manhattan, City and State of New York, United States of America, as the place wherein service is to be made on the Railroad Company of all notifications, citations, requisitions and summonses, which may be issued in judicial proceedings; *provided*, that this provision is without prejudice to any provision of the laws of the Republic of Cuba applicable to foreclosure or other proceedings specifically provided for by law. All notices to the Trustee on the part of the holders of the Bonds shall be served upon the Trustee at its office in the Borough of Manhattan, City, County and State of New York, United States of America.

In August 1934, Cuba, acting in the exercise of its sovereign powers, declared and decreed a moratorium on debts and monetary obligations incurred and owing by its citizens and residents. By that moratorium and amendments thereto, the maturity date of all debts was fixed at June 30, 1970, and the rate of interest that could be demanded by creditors was fixed at 1 per cent of the principal of debts, where such principal exceeded $800,000.

The English translations of pertinent excerpts of Cuba's Decree Law No. 412 of August 14, 1934, are as follows:

## TITLE V, CHAPTER II

### SECTION FIRST

Article 52. The moratoriums which this law establishes comprise not only the principal and interest at present due, but also those which mature during its life, to the extent that the former or the latter is not demandable according to the provisions of this Law.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

### SECTION SECOND

Article 65. Debtors shall be entitled to waive the benefits of this law, but that waiver, except as provided in Article 67, shall not be efficacious unless it meets the following requirements:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Article 67. The tacit waiver of the benefits of this law which is presumed from the making of voluntary payments shall be understood as limited exclusively to the amounts paid in excess of those demandable, which, if the debtor shall so require at any time during the life of this law, shall be considered as advance instalments on account of the unavoidable payments which in future must be made in accordance with its provisions.

### CHAPTER III

### Judicial Proceedings

### SECTION FIRST

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Article 78. The provisions of the Mortgage Law, of the Regulations issued for its execution, of the Law of Civil Procedure, and of the other laws in force which establish procedure, suits or summary proceedings for the collection of claims subject to any of the moratoriums established, or for taking possession and administration of properties covered by the benefits of this Law, are suspended, to the extent that may be necessary to comply with this law; and in like manner any other special procedure covenanted by the parties within or outside of Cuba, to enforce the rights of the creditor, is declared suspended.

On June 4, 1940, the Constitutional Convention of Cuba adopted transitory provisions and rules for the liquidation of the Moratorium Laws of Cuba and/or debts for which demand was suspended. The English translation of the pertinent provisions of the Transitory Provision of June 4, 1940, is as follows:

Second: All interest in arrears that is due when the Transitory Provision becomes effective, as well as any amounts due for commissions, costs, fines, or other penalties, and similar items, even though said interest or amounts have been capitalized, shall be uncollectible; but from its effective date the obligations in question shall bear interest according to the amount of principal, payable as determined by Decree-Laws 412 and 594 of 1934, and in accordance with the rate resulting for each one from application of the following scale; \* \* \* and, finally, when it exceeds $800,000, the obligation in question shall bear interest at 1% per annum. The provisions of the present Rule shall be applied to the obligations referred to in the initial paragraph of this Transitory Provision,

whether or not they bear interest, whether the interest is agreed or legal, and regardless of what the agreed rate is, if there is one.

\* \* \* \* \* \* \*

All interest that has been accumulated on mortgage loans shall be eliminated and shall be null and uncollectible, so that in this matter interest shall be earned and be collectible only on the unpaid part of the principal.

\* \* \* \* \* \* \*

Eighth: \* \* \* Any amount paid in excess of what was required to be paid in accordance with Decree-Laws 412 and 594 of 1934 shall be applied to the payments that are to be made in accordance with this provision, provided the debtor has not received any benefit in compensation for said payment in excess.

After enactment of the Moratorium Decree Laws, petitioner continued to pay interest on its bonds at the contract rate under its first mortgage agreement, namely 6 per cent, for all periods to and including the fiscal year ended June 30, 1948, but reserved all its rights under the Second Transitory Provision to Title Fourth of the Cuban Constitution, effective June 4, 1940, including the right to apply the part of each interest payment during each of the said periods which was in excess of 1 per cent per annum to any future payments which might be required to be made under the terms of such Transitory Provision. These interest payments were claimed as deductions by the petitioner in its United States corporation income tax returns filed during this stated period and were not disallowed, in whole or in part, by the Internal Revenue Service.

For the 6-month period ended December 31, 1948, petitioner again paid interest at the contract rate of 6 per cent, totaling $90,000, but reserved its right to apply that amount of interest payments which was in excess of 1 per cent to any future payments which might be required to be made under the terms of the Transitory Provision. The respondent has disallowed $75,000 of the $90,000 as a deduction with respect to this 6-month period.

Prior to the due date of the July 1, 1949, interest coupons, petitioner mailed on June 30, 1949, a letter to its bondholders containing an offer by petitioner to make payment upon the interest coupons at the rate of 4 per cent rather than 6 per cent and outlined the terms and conditions, including completion and execution of a prescribed letter of transmittal, that need be complied with by such bondholders in order to accept petitioner's offer. At some time after June 30, 1949, but before January 1, 1950, the holders of approximately 95 per cent of the principal amount of the bonds outstanding accepted petitioner's offer and received payment of interest at the rate of 4 per cent, totaling $60,000. As to this payment, petitioner again reserved all its rights under the Transitory Provision, including the right to apply that part of such payment in excess of interest at the rate of 1 per cent to any future payments which might be required to be made under the terms of the Transitory Provision. The respondent has disallowed

$45,000 of the $60,000 applicable to this 6-month period ending June 30, 1949.

Prior to the due dates of the January 1 and July 1, 1950, and January 1 and July 1, 1951, interest coupons, petitioner made similar offers to its bondholders to pay interest at the rate of 4 per cent with respect to the stated interest coupons and outlined similar terms and conditions for bondholders' acceptance thereof. In all cases, the holders of at least 95 per cent of the principal amount of bonds outstanding, within the following 6 months after each due date, accepted petitioner's offers. For the fiscal years ended June 30, 1950, and June 30, 1951, petitioner made interest payments at the rate of 4 per cent, totaling $120,000 with respect to each year, but at all times reserved its right to apply the amount of such interest payments in excess of 1 per cent to any future payments which might be required to be made under the terms of the Transitory Provision. Respondent has disallowed $90,000 of said item of $120,000 with respect to each fiscal year as a deduction.

On May 17, 1951, petitioner forwarded to its stockholders a letter relating to a proposed Plan for Readjustment of its bonded debt and a notice of special meeting of stockholders to be held on July 19, 1951, for the purpose of considering and acting upon the approval and authorization of such proposed Plan for Readjustment. The special meeting of stockholders of petitioner was held in the city of Portland, Maine, on July 19, 1951, but was adjourned to August 2, 1951, on which date the stockholders of petitioner approved and authorized the Plan for Readjustment.

Pursuant to such stockholders' approval, petitioner forwarded a 17-page communication dated October 25, 1951, together with 10 pages of exhibits, to the holders of its bonds requesting their acceptance of the Plan for Readjustment of its bonded debt and stating petitioner's proposed action in the event the requisite number of bondholders did not accept the Plan. A summary of the communication is stated therein as follows:

In essence, if you accept the Plan and it becomes operative, your holding will become a 4% fixed interest bond due June 30, 1970, with provision for retirements by purchases at the rate of 1% per annum. If the plan does not become operative, it is the intention of the Company, as directed by shareholders, to discontinue the making of offers as heretofore made to pay interest at the rate of 4% per annum and to pay in accordance with the Transitory Provision.

The "Reasons for the Plan" were stated on page 7 of the communication as follows:

In view of the adoption of a new Constitution in the Republic of Cuba in 1940, which contained as a part thereof the Second Transitory Provision to Title Fourth thereof relating to the time, manner and amount of payments required to be made on existing indebtedness, there exists a conflict between the laws

of the United States and the laws of the Republic of Cuba upon the question whether the Company is in default upon its existing First Mortgage Bonds and the times and amounts of payments required to be made thereon, with attendant uncertainty as to the right of the Company to pay dividends and obtain releases and substitutions of property under its First Mortgage. The purpose of the Plan is to settle such conflict of laws upon a permanent, contractual basis, within the framework of the Regulations to the Transitory Provision, which will be binding upon all bondholders, the Company and the Trustee under the First Mortgage.

The Plan for Readjustment, if it became operative, would provide, *inter alia*, that (a) each bondholder would agree that the principal of the bonds would be payable in full on June 30, 1970, and that he would not demand or sue for any part of such principal until such date, and petitioner would renounce its right to pay or cause to be paid principal of the bonds in installments as established in the Transistory Provision, (b) each bondholder would agree that interest upon the bonds shall be payable at the rate of 4 per cent per annum and petitioner would renounce its right to pay interest upon the bonds at the reduced rate established in the Transitory Provision, namely, 1 per cent, (c) each bondholder and the trustee would forever waive any and all defaults which may have occurred under the first mortgage, and (d) petitioner would agree that it would not assert its right under the Transitory Provision to apply interest paid prior or subsequent thereto in excess of the requirements of the Transitory Provision toward the satisfaction of the necessary future payments, thereby permanently waiving its right granted by Article 67 of Decree Law No. 412 of 1934.

In the event the Plan for Readjustment did not become operative, the petitioner would thereafter pay the principal of and interest upon the first mortgage bonds in accordance with the Transitory Provision. Petitioner would continue to reserve its rights at any time to take credit for prior payments of interest which were in excess of the 1 per cent payment required by the Transitory Provision.

After acceptance of the Plan for Readjustment by the requisite number of its bondholders, petitioner entered into and executed in New York City a supplemental indenture to the first mortgage agreement with the Irving Trust Company on July 1, 1952, of which the following are the more pertinent terms:

(1) That the Transitory Provision to the Cuban Constitution was applicable to petitioner's mortgage indebtedness; (2) that pursuant to these moratorium laws and the Railroad Law and Mortgage Laws in force in Cuba, jurisdiction of all proceedings for the collection of claims against railroad companies with property in Cuba and secured by mortgages was solely in the Court of First Instance of the city of Havana, Cuba; (3) the bondholders upon surrender of their 6 per cent gold bonds would receive new bonds bearing interest at the rate

850

of 4 per cent; (4) petitioner irrevocably waived all its rights under the moratorium laws, including the right to credit all interest theretofore or thereafter paid in excess of 1 per cent towards amortization of principal and future interest payments and assumed an unconditional obligation to pay the principal amount of the bonds and interest thereafter at the rate of 4 per cent per annum; (5) and the trustee in the exercise of the rights and powers invested in it by the first mortgage, as supplemented by the Supplemental Indenture was to act without prejudicing in any way the jurisdiction of the Cuban courts in matters relating to the enforcement according to the laws of Cuba of the mortgage created by the first mortgage, as supplemented by the Supplemental Indenture.

Commencing with the year of the petitioner's operations in the Republic of Cuba in 1909 and until the fiscal year ended June 30, 1923, the petitioner depreciated its bridges and culverts in accordance with the straight-line method of depreciation, at the rate of 2 per cent on items of steel and concrete construction and at the rate of 5 per cent on items of wooden construction.

From July 1, 1923, through June 30, 1949, petitioner, for reasons which are unknown at this time, suspended taking depreciation on its bridges and culverts on the straight-line method of depreciation. During this period, petitioner capitalized all substantial improvements to its bridges and culverts and any retirement or abandonment of such assets during the period was charged against the reserve for depreciation as to such assets accumulated as of June 30, 1923, and an offsetting credit was made to the respective asset account. Such retirements were not charged to an expense account during the stated period.

In response to a specific inquiry made by an internal revenue agent requesting advice as to the method of accounting used with respect to petitioner's bridges and culverts for the period 1923 to July 1, 1949, petitioner's accountants, by letter dated May 12, 1952, specifically stated that the method of accounting used by petitioner with respect to bridges and culverts during the stated period was the same as for other fixed assets, in that bridges etc. destroyed were removed from the account and the new ones capitalized. Petitioner's United States corporation income tax return for the fiscal year ended June 30, 1949, shows that the method of depreciation utilized with respect to the fixed assets of petitioner was the straight-line method.

In its United States corporation income tax returns for the fiscal years ended June 30, 1950 and 1951, petitioner again claimed depreciation deductions on the straight-line method with respect to its bridges and culverts in the respective amounts of $18,979.41 and $18,980.16. The respondent has disallowed these amounts in their entirety for each of the fiscal years involved. In a statement attached

to the deficiency notice, he gave as his reason for such disallowance "that you had never received permission from the Commissioner to change your method of depreciating said assets from the retirement method of depreciation to the straight-line method of depreciation." Petitioner at no time during the period 1923 to July 1, 1949, utilized the retirement method of depreciation in connection with its bridges and culverts.

The correct depreciation deductions allowable to petitioner on its bridges and culverts for the fiscal years ended June 30, 1950 and 1951, are the respective amounts of $5,886.58 and $5,774.64 rather than the amounts claimed by petitioner for those years as set forth above.

On petitioner's United States corporation income tax return for the taxable year ending June 30, 1949, petitioner claimed a credit for taxes paid to the Republic of Cuba in the amount of $31,782.88. In its "Statement" in support of the credit claimed (Form 1118) it listed $22,452.27 of the amount claimed as being imposed by "Cuban Profits Tax—Law of January 29, 1931 (as amended)" and the balance of $9,330.61 as being imposed by "Article X of Gross Sales and Receipts Law of October 9, 1922 and modifications Republic of Cuba." The respondent allowed the $22,452.27 as a credit for income taxes paid to a foreign country under section 131(a)(1) of the Internal Revenue Code of 1939, but disallowed as a "credit" the amount of $9,330.61. Instead, the respondent allowed the amount of $9,330.61 as a "deduction" from gross income under section 23(c) of the Internal Revenue Code of 1939. The same situation existed for the 2 following taxable years, the amounts involved being as follows:

| Taxable year ending June 30— | Credit claimed by petitioner | "Credit" allowed by respondent | "Deduction" allowed by respondent |
|---|---|---|---|
| 1950 | $29,647.06 | $21,894.41 | $7,752.65 |
| 1951 | 94,835.19 | 83,134.93 | 11,700.26 |

By Decree Law 393 of November 8, 1935, the tax on the gross sale, exchange, or transfer of merchandise and upon gross receipts, created by the Cuban Gross Sales and Receipts Law of October 9, 1922, as amended, was superseded and intended to be then governed by the provisions of Decree Law 393 which specifically provided (English translation) in article IX thereof as follows:

To the effects of this Decree-Law, the following natural or juridical persons shall be considered as merchants and therefore subject to the payment of the 1½% tax on gross receipts:

\* \* \* \* \* \* \*

12. Those who directly or indirectly transport passengers or freight in any manner, whether by land, sea, or air \* \* \*

Subsequently, the rate of tax on both gross sales and gross receipts was increased to 2.75 per cent and, finally, by Decree Law No. 643 of March 27, 1946, the tax on gross sales was drastically changed, where formerly it had applied to every sale down to the retail level, it was then limited to the first sale of domestic products or to the moment of importation through customs in the case of imported goods. The rate of this tax on gross sales was increased to a maximum of 9 per cent, but the rate of tax on gross receipts remained unchanged and the scope and applicability of the tax has undergone very few changes since it was originally enacted, including changes, if any effected by Decree Law No. 5122 of December 2, 1949.

OPINION.

Section 23 (b) of the Internal Revenue Code of 1939 provides that in computing net income there shall be allowed as a deduction "[a]ll interest paid or accrued within the taxable year on indebtedness." Since petitioner was on the "accrual" as distinguished from the "cash" basis of accounting, only the interest that is currently "accrued within the taxable year on indebtedness" is deductible. *United States* v. *Olympic Radio & Television*, 349 U.S. 232; *Lewyt Corporation* v. *Commisisoner*, 349 U.S. 237.

The facts, as more fully set forth in our findings, show that although there existed a conflict in the laws of the United States and the Republic of Cuba as to whether petitioner was obligated to pay interest on its bonds in excess of 1 per cent per annum, petitioner nevertheless actually paid interest on all its bonds at the rate of 6 per cent per annum for the 6-month period ending December 31, 1948, and at the rate of 4 per cent per annum for each of the 5 remaining 6-month periods. In making these payments, petitioner reserved what rights it may have had under Article 67 of Cuba's Decree Law No. 412 of August 14, 1934, to have the payments made in excess of 1 per cent "considered as advance installments on account of the unavoidable payments which in future must be made in accordance with its provisions." Respondent contends that because of this reservation petitioner did not incur a liability for interest in excess of 1 percent per annum and that therefore only $30,000 of interest "accrued" within each of the taxable years before us. We do not agree with this contention.

There can be no question that if it had not been for the moratorium on debts decreed by the Republic of Cuba in 1934 petitioner would have been obligated in each of the taxable years before us to pay the full 6 per cent interest on its $3,000,000 of outstanding bonded indebtedness. In 1943, a bondholder of another American company doing business in Cuba refused to recognize the validity of the Cuban mor-

atorium legislation and brought an action in the Municipal Court of the City of New York and recovered the full interest provided for in her interest coupon. See *Myles* v. *Cuba R. Co.*, 182 Misc. 169, 48 N.Y.S. 2d 148, affirmed per curiam by New York Supreme Court April 27, 1944, 50 N.Y.S. 2d 667.[1] Notwithstanding the moratorium, petitioner continued to pay interest on its bonds at the full rate of 6 per cent through December 31, 1948. Article 65 of Cuba's Decree Law No. 412 of August 14, 1934, provided that "[d]ebtors shall be entitled to waive the benefits of this law" and article 67 provided that:

The tacit waiver of the benefits of this law which is presumed from the making of voluntary payments shall be understood as limited exclusively to the amounts paid in excess of those demandable, which, if the debtor shall so require at any time during the life of this law, shall be considered as advance instalments on account of the unavoidable payments which in future must be made in accordance with its provisions.

On June 30, 1949, and for each 6-month period thereafter during the taxable years here in question, petitioner, because of the conflict between the laws of the United States and the Republic of Cuba, offered to pay its bondholders interest on its bonds at the rate of 4 per cent per annum instead of the 6 per cent called for by the bonds, provided the bondholders surrendered their coupons and accepted such offer as a full discharge of petitioner's obligation for interest on such coupons and with the understanding that petitioner was reserving what rights it might have under the Cuban laws to apply any payments of interest in excess of 1 per cent against future obligations. Petitioner at no time ever attempted to exercise any of those reserved rights and, as set out in our findings, irrevocably waived them on July 1, 1952, upon the execution of the supplemental indenture to the first mortgage. Substantially all of the bondholders accepted petitioner's offer of June 30, 1949, and also each of the 4 succeeding offers made at intervals of 6 months, and payment of interest at the rate of 4 per cent per annum was made accordingly.

Respondent, in contending that, because of the rights reserved by petitioner to apply any payments of interest in excess of 1 per cent against future obligations, it could "accrue" during the taxable years

---

[1] In this case the plaintiff was a bondholder of the defendant corporation, a New Jersey corporation which carried on its sole business operations in Cuba. The action was brought to collect the interest payment which had become due on January 1, 1941, on defendant's first mortgage 5 per cent 50-year gold bond which had been issued in New York City in 1902. Defendant set up an affirmative defense that the provisions of the Cuban moratorium legislation (the same as is here involved) prohibited the payment of interest at a rate in excess of 1 per cent per annum after June 4, 1940. In rendering judgment for the plaintiff for the full 5 per cent interest, the court in its opinion, stated in part:

"The mortgage was made in New York, and the bonds, both principal and interest, are payable in New York. The action was brought in New York where the plaintiff has a right to bring it. The coupon is a common law obligation enforceable without the aid of statute. It is not 'some peculiar liability, or remedy, created by a foreign state.' * * *

"There is nothing in the laws of Cuba which operated to confine the rights of the obligee's remedy upon his coupon to the courts of Cuba. The aforementioned laws of Cuba have no extra-territorial effect * * *"

before us only the 1 per cent, would apparently permit petitioner to "accrue" all the interest it had paid in excess of 1 per cent in the taxable year in which the supplemental indenture to the first mortgage was executed, namely, July 1, 1952, when this right was irrevocably waived.

This argument of respondent's would no doubt find support in *Security Flour Mills Co.* v. *Commissioner*, 321 U.S. 281, if petitioner had paid no more than 1 per cent while disputing its liability for a greater amount. But the rule that one may not accrue a liability he disputes has an exception where the liability is in fact paid even though the payment be made under protest. The rule which we think has been very generally accepted is aptly stated in *Chestnut Securities Co.* v. *United States*, 104 Ct. Cl. 489, 62 F. Supp. 574, as follows:

One is not entitled to accrue a debt or other liability which is asserted against him but which he disputes and litigates, until the litigation is concluded. But if a liability is asserted against him and he pays it, though under protest, and though he promptly begins litigation to get the money back, the status of the liability is that it has been discharged by payment. It is hardly conceivable that a liability asserted against him, which he has discharged by payment, has not yet "accrued" within the meaning of the tax laws and the terminology of accounting. Accrual, from the debtor's standpoint, precedes payment, and does not survive it.

The following cases hold likewise. *Baltimore Transfer Co.*, 8 T.C. 1; *Gibson Products Co.*, 8 T.C. 654, 659; *Western Cartridge Co.*, 11 T.C. 246, 266–267; *Consolidated Edison Co. of New York* v. *United States*, 133 Ct. Cl. 376, 135 F. Supp. 881, certiorari denied 351 U.S. 909; *Landers, Frary & Clark* v. *United States*, 137 Ct. Cl. 870, 159 F. Supp. 202; *National Biscuit Co.* v. *United States*, 140 Ct. Cl. 443, 156 F. Supp. 916.

In the instant case we think that whatever impediments may have existed during the taxable years here involved, which respondent is contending have the effect of limiting petitioner's accrual of interest on its bonds to a rate of 1 per cent per annum, were completely discharged by payment of interest in excess of the 1 per cent. "Accrual, from the debtor's standpoint, precedes payment, and does not survive it." *Chestnut Securities Co.* v. *United States, supra.*

In addition to the reservation question which we have just discussed, namely, petitioner's right to apply that part of its interest payments in excess of 1 per cent to future payments, respondent contends that since petitioner's offer to pay interest in excess of 1 per cent was not accepted within the taxable year ended June 30, 1949, no more than interest at the rate of 1 per cent "accrued" within the last 6-month period of that taxable year. In support of this contention, the respondent relies primarily upon *Cuba Railroad Co.* v. *United States*, 254 F. 2d 280 (C. A. 2, 1958). The taxpayer in that case, because of *Myles* v. *Cuba R. Co., supra*, found itself threatened with

claims by its bondholders. It therefore offered a compromise called "The Plan," by which it offered to pay 3 per cent instead of 1 per cent to all bondholders who should deposit their bonds with a designated trustee. The United States Treasury Department claimed that the interest on the bonds deposited *after* 1943 was not a deduction allowable *in 1943*. In agreeing with the Treasury, Circuit Judge Hand said:

Little need be said in answer to the plaintiff's argument that on the merits it was entitled to a deduction for interest due on the undeposited bonds. The "Plan" of 1942 provided for the payment of interest on the bonds at three per cent *only on condition that the bondholders deposited their bonds with the designated trustee.* As we have said, during the year 1943 the taxpayer was still contesting the right of its bondholders to any interest above one per cent, except in so far as such a right was granted under the "Plan." That being true, it could claim no deduction except for what became due in that year under the "Plan." *Such bondholders as had not deposited then might never do so, yet their right to recover the stipulated three per cent was conditional upon such a deposit;* therefore it had not then "accrued." Dixie Pine Co. v. Commissioner, 320 U.S. 516 * * * [Emphasis supplied.]

Petitioner attempts a distinction of the above case which we do not believe is valid. In our opinion, the debtor's offer to pay interest in excess of 1 per cent was conditioned upon the bondholders' depositing their bonds with the designated trustee just as in the instant case petitioner's offer to pay interest in excess of 1 per cent was conditioned upon the bondholders' accepting such offer and presenting their coupons, together with the executed letter of transmittal, to the trustee. Since these conditions were not met within the taxable year ended June 30, 1949, we hold that for the last 6 months of that year interest accrued only at the rate of 1 per cent and, of the $60,000 paid by petitioner, only $15,000 is deductible for that year. *Cuba Railroad Co.* v. *United States, supra.* We hold, further, that the balance of the $60,000, namely, $45,000 is deductible for the taxable year ended June 30, 1950, as the conditions of petitioner's offer were met within the first 6 months of that year.

Substantially the same offers were made by petitioner for each of the four 6-month periods following the 6-month period ending June 30, 1949, as were made for that period, and substantially the same acceptances were made by the bondholders. We hold that the interest deductible for these four 6-month periods should follow the same pattern as for the 6-month period ending June 30, 1949. Therefore, of the interest claimed by petitioner for the 3 years here in question, we hold that it is entitled to deduct $105,000 for the year ended June 30, 1949, and $120,000 for each of the 2 following years.

Little need be said concerning the second issue involving depreciation of bridges and culverts for the taxable years ended June 30, 1950, and June 30, 1951. As to these 2 years the petitioner claimed depreciation of such properties under the straight-line method. The respondent disallowed the entire amounts claimed for the reason given

in the statement attached to the deficiency notice "that you had never received permission from the Commissioner to change your method of depreciating said assets from the retirement method of depreciation to the straight-line method of depreciation." We have found as an ultimate fact that at no time during the period 1923 to July 1, 1949, did petitioner utilize the retirement method of depreciation in connection with its bridges and culverts. During this period it merely suspended taking any depreciation on such properties. Prior thereto it had been taking depreciation on its bridges and culverts according to the straight-line method and during the taxable years it merely resumed taking depreciation according to this method. No permission from the Commissioner was necessary to do this. The parties have stipulated that in the event this Court should hold that no permission to claim depreciation according to the straight-line method was necessary, then the correct amounts allowable are those set out in our findings. We so hold.

Our final question at issue is whether the gross sales and receipts taxes imposed by the Republic of Cuba upon petitioner for the taxable years involved qualify for the foreign tax credit provided for in section 131(a) (1) and (h) of the Internal Revenue Code of 1939.[2] As set out in our findings, the respondent has allowed petitioner a "credit" under section 131(a) (1) for the "Cuban Profits Tax—Law of January 29, 1931 (as amended)." He has disallowed as a "credit" the amounts[3] here in question which were imposed under the Cuban Gross Sales and Receipts Law of October 9, 1922, as amended, on the ground that the tax so imposed "is not deemed to be an income tax." (Quoted matter from statement attached to deficiency notice.) In lieu of a "credit" the respondent has allowed the amounts as "deductions" from gross income under section 23(c) of the Internal Revenue Code of 1939.[4]

---

[2] SEC. 131. TAXES OF FOREIGN COUNTRIES AND POSSESSIONS OF UNITED STATES.

.(a)· ALLOWANCE OF CREDIT.—If the taxpayer chooses to have the benefits of this section, the tax imposed by this chapter * * * shall be credited with:

(1) CITIZENS AND DOMESTIC CORPORATIONS.—In the case of * * * a domestic corporation, the amount of any income, war-profits, and excess-profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States;

*     *     *     *     *     *     *

(h) CREDIT FOR TAXES IN LIEU OF INCOME, ETC., TAXES.—For the purposes of this section and section 23(c) (1), the term "income, war-profits, and excess-profits taxes" shall include a tax paid in lieu of a tax upon income, war-profits, or excess-profits otherwise generally imposed by any foreign country or by any possession of the United States.

[3] The amounts are as follows:

| Fiscal year ended June 30— | Amount |
|---|---|
| 1949 | $9, 330. 61 |
| 1950 | 7, 752. 65 |
| 1951 | 11, 700. 26 |

[4] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

*     *     *     *     *     *     *

(c) TAXES GENERALLY.—

(1) ALLOWANCE IN GENERAL.—Taxes paid or accrued within the taxable year * * *

Petitioner contends, however, that the amounts in question are allowable as a "credit" under section 131(h), *supra*, as being a tax "in lieu of a tax upon income."

Substantially the same contention as made by petitioner was made by the taxpayer in *Lanman & Kemp-Barclay & Co. of Colombia*, 26 T.C. 582. In that case we fully considered the report of the Senate Committee on Finance, S. Rept. No. 1631, 77th Cong., 2d Sess., pp. 131–132, together with respondent's Regulations 111, section 29.131–2, which are applicable here, and concluded that the tax there involved was neither an income tax nor a tax in lieu of a tax on income within the meaning of section 131 of the Internal Revenue Code of 1939. We think the same holding should be made here. As set out in our findings, Cuba imposed upon petitioner a profits tax for the 3 years here involved in the amounts of $22,452.27, $21,894.41, and $83,134.93, respectively. The respondent has allowed these amounts as credits under section 131(a)(1). The amounts in question of $9,330.61, $7,752.65, and $11,700.26 were imposed under the Gross Sales and Receipts Law of October 9, 1922, and were imposed in addition to the profits taxes and not "in lieu" thereof. "A tax which runs parallel to a tax upon income generally imposed, is not a tax 'in lieu' of the income tax. (Cf. Regulations 118, 39.131(h)–1(b)." *Abbot Laboratories International Co.* v. *United States*, 160 F. Supp. 321 (N.D. Ill., 1958). See also *American Metal Co.*, 19 T.C. 879, affd. 221 F. 2d 134 (C.A. 2), certiorari denied 350 U.S. 829. We sustain the respondent's determination upon this issue.

*Decision will be entered under Rule 50.*