## F. W. WOOLWORTH CO., PETITIONER *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 84442, 91247, 2130–62.   Filed June 15, 1970.

*Charles B. McInnis, G. Kibby Munson, Roger H. Munzall,* and *James J. O'Neil,* for the petitioner.
*William F. Chapman,* for the respondent.

1234

---

[1] All statutory references will be to the 1954 Internal Revenue Code, as amended, unless otherwise noted.

1244

OPINION

*Issue I. Eligibility for Foreign Tax Credit of Certain Taxes Paid to Great Britain*

Prior to 1918, taxes paid to foreign countries were allowed as a deduction only from United States income with the result that the same income was often subject to taxation by two sovereigns, i.e., the United States and the foreign country. In order to mitigate this heavy burden of double taxation, Congress included within the Revenue Act of 1918 provisions allowing a credit, as distinguished from a deduction, against the United States tax for certain taxes paid to foreign countries and United States possessions. Secs. 222 and 238, Revenue Act of 1918; H. Rept. No. 767, 65th Cong., 2d Sess. (1918), 1939–1 C.B. 93; 56 Cong. Rec. 677–678 (1918); *Burnet* v. *Chicago Portrait Co.*, 285 U.S. 1, 7 (1932). Successor provisions pertaining to the foreign tax credit are currently embodied in sections 901 through 905 of the Code. Section 901 provides in part that the taxpayer may elect to have the amount of any "income, war profits, and excess profits taxes" paid to a foreign country or United States possession plus any such taxes deemed to have been paid under section 902 credited against his United States tax liability. Under section 902, a domestic corporation, which owns 10 percent or more of the voting stock of a foreign corporation from which it receives dividends, is deemed for purposes of the foreign tax credit to have paid the foreign income, war profits, and excess profits taxes paid by the foreign corporation with respect to such dividends.

Petitioner contends at the outset that inasmuch as it owned 52.7 percent of the voting stock of F. W. Woolworth & Co., Ltd. (England), during the years involved herein, it is entitled to a credit under

sections 901(a)[2] and 902(a)(1)[3] for certain taxes paid by such British subsidiary during the years 1957, 1958, and 1959 under schedule A of the English Income Tax Act of 1952. Respondent has allowed petitioner a foreign tax credit for the years involved herein with respect to certain separately levied profits taxes and certain taxes paid by petitioner's British subsidiary under schedule D of the English Income Tax Act, 1952. However, as regards the schedule A taxes at issue, respondent argues that such taxes do not qualify as "income" taxes within the intendment of sections 901 and 902. We are constrained to agree with the respondent.

Petitioner unsuccessfully litigated this issue once before in the case of *F. W. Woolworth Co.* v. *United States*, 15 F. Supp. 679 (S.D. N.Y. 1936), affirmed on this issue 91 F.2d 973 (C.A. 2, 1937), certiorari denied 302 U.S. 768 (1937). Therein the District Court and the Second Circuit both held that taxes paid by petitioner's British subsidiary under schedule A of the British Income Tax Act of 1918 (the provisions of which are in all material respects the same as those under schedule A of the British Income Tax Act of 1952) did not for purposes of the foreign tax credit constitute "income taxes" within the meaning of section 238(e), I.R.C. 1921 (progenitor of section 902, I.R.C. 1954). Nevertheless, petitioner contends on brief that the earlier case was submitted on written stipulation and that the result therein might well have been different if the District Court and Second Circuit had had the benefit of the testimony of petitioner's expert witness herein, Frank Heyworth Talbot (hereinafter referred to as Talbot), an English barrister who has specialized in British revenue law since 1931. While we indeed found Talbot's testimony to be most helpful and enlightening with respect to an understanding of the history, intent, and operation of the British Income Tax Act of 1952,

[2] SEC. 901. TAXES OF FOREIGN COUNTRIES AND OF POSSESSIONS OF UNITED STATES.

(a) ALLOWANCE OF CREDIT.—If the taxpayer chooses to have the benefits of this subpart, the tax imposed by this chapter shall, subject to the applicable limitation of section 904, be credited with the amounts provided in the applicable paragraph of subsection (b) plus, in the case of a corporation, the taxes deemed to have been paid under section 902 * * *

[3] SEC. 902. CREDIT FOR CORPORATE STOCKHOLDER IN FOREIGN CORPORATION.

(a) TREATMENT OF TAXES PAID BY FOREIGN CORPORATION.—For purposes of this subpart, a domestic corporation which owns at least 10 percent of the voting stock of a foreign corporation from which it receives dividends in any taxable year shall—

(1) to the extent such dividends are paid by such foreign corporation out of accumulated profits (as defined in subsection (c)(1)(A)) of a year for which such foreign corporation is not a less developed country corporation, be deemed to have paid the same proportion of any income, war profits, or excess profits taxes paid or deemed to be paid by such foreign corporation to any foreign country or to any possession of the United States on or with respect to such accumulated profits, which the amount of such dividends (determined without regard to section 78) bears to the amount of such accumulated profits in excess of such income, war profits, and excess profits taxes (other than those deemed paid) ; and

such testimony has served to reinforce our conviction that the earlier *F. W. Woolworth Co.* case was correctly decided on this issue.

Talbot's testimony and other evidence of record establish the following facts regarding the Income Tax Act, 1952, which governed the charge, assessment, and levy of income tax in the United Kingdom during the years involved herein. That Act classified all taxable income into five basic categories or schedules:

Schedule A—Income derived from the ownership of land.

Schedule B—Income derived from the occupancy of land (i.e., farming).

Schedule C—Income derived from the ownership of government stocks.

Schedule D—Income not covered by schedules A, B, C, or E is included in the following six subdivisions or cases:

Case I—Profits from any trade.

Case II—Profits from any profession or vocation.

Case III—Income from interest, annuities, and annual payments received from governmental sources.

Case IV—Income from foreign securities.

Case V—Income from foreign possessions other than government securities.

Case VI—All gains or profits not falling under schedules A, B, C, or E or under cases I, II, III, IV, or V of schedule D.

Schedule E—Income derived from public office.

The same rate of tax applied to all taxable income regardless of the schedule applicable to such income. Schedule A of the Income Tax Act, 1952, levied a tax "in respect of the property in all lands, tenements, hereditaments and heritages in the United Kingdom capable of actual occupation," based upon its annual rental value.[4] The occupier of the property, whether the owner or the tenant, was required to pay the tax under schedule A in the first instance, but the burden of the tax was ultimately borne by the owner. Thus, if the occupier was a tenant, he was entitled to deduct the tax paid under schedule A from the rent payable to the owner. A long-standing controversy among United Kingdom attorneys concerning the proper characterization

---

SCHEDULE A

1. Tax under this Schedule shall be charged in respect of the property in all lands, tenements, hereditaments and heritages in the United Kingdom capable of actual occupation, for every twenty shillings of the annual value thereof:

   *       *       *       *       *       *       *

2. The annual value for the purposes of this Schedule shall, in the case of all lands, tenements, hereditaments or heritages, of whatever nature and for whatever purpose occupied or enjoyed, and of whatever value, be understood to be—

(a) if they are let at a rack rent and the amount of that rent has been fixed by agreement commencing within the period of seven years preceding the fifth day of April next before the time of making the assessment, the amount of the rent by the year at which they are let; or

(b) if they are not let at a rack rent so fixed, then the rack rent at which they are worth to be let by the year:

Provided that where the annual value of any property is to be determined as for year preceding a year of revaluation, this paragraph shall have effect as if the seven years referred to in sub-paragraph (a) thereof were the seven years ending immediately before the commencement of the said preceding year.

of the tax under schedule A was laid to rest in the case of *London County Council* v. *Attorney General*, [1901] A.C.26. In that case the House of Lords unanimously held that the tax under schedule A, just as the tax levied under all other schedules of the Act, was an income tax rather than a property tax.

In determining whether the tax under schedule A of the Income Tax Act, 1952, qualifies as an "income tax" within the meaning of sections 901 and 902, the characterization of the tax under United Kingdom law is far from conclusive. It is well settled that the standard to be applied in making this determination is whether the foreign tax is the substantial equivalent of an "income tax" as that term is used and understood under the revenue laws of the United States. *Biddle* v. *Commissioner*, 302 U.S. 573 (1938); *Commissioner* v. *American Metal Co.*, 221 F. 2d 134, 137 (C.A. 2, 1955), affirming 19 T.C. 879 (1953), and the cases cited therein. The United States concept of income has been defined as "a gain realized or a profit derived from capital, labor, or both." *Keasbey & Mattison Co.* v. *Rothensies*, 133 F. 2d 894 (C.A. 3, 1943), and the authority cited there. Thus, it can be seen that the United States concept of "income" is based upon gain or profit realized by the taxpayer (i.e., net income as opposed to gross income, gross sales, or some other basis). See *Allstate Insurance Co.* v. *United States*, 419 F. 2d 409, 414 (Ct. Cl. 1969). By no stretch of the imagination could it be said that the tax under schedule A on the ownership of property as measured by its annual rental value, which may be an estimated figure, falls within the scope of this concept.

The testimony of Talbot buttresses our conclusion that the tax under schedule A is *not* the substantial equivalent of an "income tax" as that term is understood under United States revenue laws. Talbot's explanation of the nature and operation of the tax under schedule A in response to the hypothetical situation of an owner-occupier of property having an annual rental value of $20,000 was as follows:

In our concept, it's the concept of our law from very early days, and it is one that you here may not share as a concept, a person who has the ownership and occupation of land, the annual value of which is $20,000 * * * is deemed to have an income, that is to say, he has a notional income * * * of $20,000 by reason of the fact that he has the ownership of property which he could let for $20,000 but he chooses to occupy it himself and, therefore, he is regarded as the notional recipient of a $20,000 benefit.

Respondent would have us classify the tax under schedule A as a property tax. But the tax does not appear to be a true ad valorem property tax as that term is used in the United States inasmuch as the amount thereof is measured by the annual rental value of the property rather than its fair market value. However this may be, it seems clear that the tax under schedule A is not an income tax within the United States

concept of that term. We are thus reminded of the opinion written by Judge Learned Hand on behalf of the Second Circuit in *F. W. Woolworth Co.* v. *United States, supra* at 977, wherein it is stated: "A tax levied upon the use of land—however described—is not an 'income tax' of the kind here intended; it is not paid upon accumulated profits except by the fiction of treating the value of the land when occupied as a profit." We deem this opinion to be controlling of the immediate issue at hand, and therefore hold that the taxes paid by petitioner's British subsidiary to Great Britain under schedule A during the years 1957, 1958, and 1959 are *not* "income taxes" eligible for the foreign tax credit under sections 901 and 902 of the Code.

Subsequent to the decision in *F. W. Woolworth Co.* v. *United States, supra*, section 131(h), I.R.C. 1939 (predecessor of section 903, I.R.C. 1954), was enacted as a part of the Revenue Act of 1942. That section provides that for purposes of the foreign tax credit provisions "the term 'income, war profits, and excess profits taxes' shall include a tax paid in lieu of a tax on income, war profits, or excess profits otherwise generally imposed by any foreign country or by any possession of the United States." Petitioner advances the position that the taxes involved herein at least qualify as "a tax paid in lieu of a tax on income" within the meaning of section 903. Careful scrutiny of the legislative history of section 903, and of the regulations and case law interpreting that section compels us to reach a contrary conclusion.

The legislative history of the 1942 amendment adding the "in lieu" provision clearly manifests an intent to extend the scope of creditable foreign income taxes beyond the narrow confines of the United States concept of a tax imposed upon net income. See S. Rept. No. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 602; Statement of Mitchell B. Carroll, representing the National Foreign Trade Council, Hearings before the Senate Committee on Finance on the Revenue Act of 1942, 77th Cong., 2d Sess., pp. 206, 207-208, 210-212, 214-217. The Senate Finance Committee report provides in pertinent part, at 602:

> Your committee believes further amendments should be made in section 131. Under that section as it now stands, a credit is allowed against United States tax for income, war profits, or excess profits taxes paid or accrued to any foreign country or to any possession of the United States. In the interpretation of the term "income tax," the Commissioner, the Board, and the courts have consistently adhered to a concept of income tax rather closely related to our own, and if such foreign tax was not imposed upon a basis corresponding approximately to net income it was not recognized as a basis for such credit. Thus if a foreign country in imposing income taxation authorized, for reasons growing out of the administrative difficulties of determining net income or taxable basis within that country, a United States domestic corporation doing business in such country to pay a tax in lieu of such income tax but measured, for example, by gross income, gross

sales or a number of units produced within the country, such tax has not heretofore been recognized as a basis for a credit. Your committee has deemed it desirable to extend the scope of this section. * * *

While the liberalizing congressional intent underlying the enactment of the predecessor of section 903 is evident, the legislative history fails to clearly delineate the outer limits of taxes that will qualify as "in lieu" taxes under section 903. It is patent that the instant case does not present the situation described in the Senate Finance Committee report where "for reasons growing out of the administrative difficulties of determining net income" the foreign country imposed a substitute tax measured by "gross income, gross sales, or a number of units produced within the country." Of course, this example is offered only by way of illustration in the Senate Finance Committee report, and presumably was not intended to serve as the sine qua non qualification as an "in lieu" tax under section 903.

Nevertheless, our research of the cases arising under section 903 and its predecessor (sec. 131(h), I.R.C. 1939), fails to reveal any case wherein the foreign tax credit has been extended to substitute taxes measured, as in the instant case, on a basis other than gross income, gross sales, or units of production. Moreover, of the cases decided to date, the case which in our view most closely parallels the case at bar was decided adversely to the petitioner's contentions herein, i.e., *Lanman & Kemp-Barclay & Co. of Colombia*, 26 T.C. 582 (1956). That case involved a United States corporation operating in Colombia which paid both an income tax and a patrimony tax to Colombia. The patrimony tax, which was levied upon certain real and personal property reduced by debts and various exemptions, was based upon the presumption that every piece of property has a certain productive ability and the failure of the owner to achieve a return therefrom cannot deprive the State of its right to receive revenue from this potential. Under Colombian law, the patrimony tax was deemed to be a supplement to and indivisible from the income tax. Based upon the foregoing facts, this Court held that the Colombian patrimony tax failed to qualify as either an income tax or as a tax in lieu of an income tax within the meaning of the predecessors of sections 901 and 903. In accord, *Abbot Laboratories International Co.* v. *United States*, 160 F. Supp. 321 (N.D. Ill. 1958), affirmed per curiam 267 F. 2d 940 (C.A. 7, 1959). We have been unable to discern any material distinction between *Lanman & Kemp-Barclay & Co. of Colombia*, and the instant case sufficient to produce a different result herein.

In support of his position that the tax under schedule A is a tax in lieu of an income tax, petitioner constructs an ingenious argument to show that the instant case fits the mold of the section 903 regula-

tions. Section 1.903–1(a), Income Tax Regs., provides that taxes imposed by a foreign country will qualify as a tax paid in lieu of an income tax if the following conditions are met: (1) The foreign country has in force a general income tax law; (2) the taxpayer claiming the credit would, in the absence of a specific provision applicable to such taxpayer, be subject to such general income tax law; (3) the general income tax is not imposed upon the taxpayer subject to the substituted tax. Petitioner relies upon expert testimony and other evidence of record to establish that: (1) The tax under schedule D levies a general income tax; (2) under the provisions of the British Income Tax Act of 1952, petitioner was entitled to reduce its trading profits subject to tax under schedule D by the amount subject to tax under schedule A; (3) consequently the tax under schedule A was merely a substitute tax imposed in lieu of the general income tax under schedule D. Although at first blush this statutory scheme may appear to satisfy the requirements of the regulations, petitioner's argument fails to explain why (if the schedule A tax is truly only a substitute tax) an owner-occupier would owe a tax under schedule A where it has no trading profits whatsoever or where its trading profits are less than the amount subjects to tax under schedule A. Viewed in this posture it can be seen that the tax under schedule A is in substance an *additional* tax based upon the fair rental value of property owned and occupied by petitioner rather than a substitute for a general income tax.

In support of his position that the tax under schedule A is a tax in lieu of an income tax within the intendment of section 903, petitioner relies upon *Missouri Pacific Railroad Co.* v. *United States*, 392 F. 2d 592 (Ct. Cl. 1968) ; *United States* v. *Occidental Life Insurance Co. of Cal.*, 385 F. 2d 1 (C.A. 9, 1967) ; *Equitable Life Assurance Soc. of U.S.* v. *United States*, 366 F. 2d 967 (Ct. Cl. 1966) ; and *Prudential Insurance Co. of America* v. *United States*, 319 F. 2d 161 (Ct. Cl. 1963). These cases are readily distinguishable from the case at bar inasmuch as they all involve taxes imposed upon gross income or gross sales and consequently clearly qualify as "in lieu" taxes within the legislative purpose underlying the enactment of section 903. In sharp contrast, the tax involved herein is imposed upon "notional" or imputed income measured by the annual rental value of property owned and occupied by the petitioner.

In view of the foregoing, we hold that the tax paid by petitioner's British subsidiary under schedule A of the British Income Tax Act, 1952, does not qualify as an income tax or a tax in lieu of an income tax within the meaning of sections 901, 902, and/or 903.

*Issue II. Computation of the Per Country Limitation*

During the years involved herein, section 901 provided that the amount of foreign tax credit allowed to offset United States taxes was "Subject to the limitation of section 904." Section 904 in turn provided that the credit allowed with respect to taxes paid to any country "shall not exceed the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources within such country * * * bears to the entire taxable income for the same taxable year." This limitation (commonly referred to as the per country limitation)[5] on the maximum amount allowable as a foreign tax credit may be expressed by means of the following formula:

$$\text{Maximum credit allowed for taxes paid to country in question} = \frac{\text{Taxable income from country in question}}{\text{Total taxable income}} \times \text{U.S. tax before credit for foreign taxes}$$

The per country limitation is designed to prevent the foreign tax credit from being used to offset U.S. taxes properly attributable to domestic source income. H. Rept. No. 708, 72d Cong., 1st Sess. (1932), 1939–1 C.B. (Part 2) 473; *Erich O. Grunebaum*, 50 T.C. 710, 717 (1968), aff'd. 420 F. 2d 332 (C.A. 2, 1970).

The present controversy revolves around the numerator (i.e., taxable income of the particular foreign country involved) of the limiting fraction set forth above. For purposes of computing the per country limitation with respect to taxes paid by petitioner's subsidiaries to England and Germany and taxes paid by petitioner to Cuba and Puerto Rico, respondent seeks to allocate various expenses of petitioner's executive office, certain State income and franchise taxes and other general expenses to the dividend income received by petitioner from its English and German subsidiaries and to the income derived by petitioner from the operation of its Cuban and Puerto Rican branch offices. Of course, the end result of thus diminishing the numerator of the limiting fraction in computing the per country limitation with respect to each of these countries is a concomitant reduction of the maximum credit allowed petitioner for taxes paid or deemed paid to such countries.

Inasmuch as respondent first raised this issue by way of amendment to his answer, the burden of proof with respect thereto rests squarely with him. Rule 32, Tax Court Rules of Practice. In support of his

---

[5] In 1960, the Code was amended to provide an alternative limitation (known as the overall limitation) to be applied in lieu of the per country limitation at the election of the taxpayer. See sec. 904(a)(2), I.R.C. 1954; sec. 1.904–1(b), Income Tax Regs.; and S. Rept. No. 1393, 86th Cong., 2d Sess., 1960–2 C.B. 874.

position, respondent introduced the testimony of Revenue Agent Morris Pliskow to show that the allocations at issue were made in accordance with sections 861 and 862 and the regulations promulgated thereunder.[6]

Section 861 defines gross and taxable income derived from *domestic* sources, while section 862 defines gross and taxable income derived from *foreign* sources. Subsection 862(a) enumerates various items of gross income to be treated as income from sources outside the United States. Subsection 862(b) then sets forth the following method of determining taxable income from foreign sources:

> (b) TAXABLE INCOME FROM SOURCES WITHOUT UNITED STATES.—From the items of gross income specified in subsection (a) there shall be deducted the expenses, losses, and other deductions properly apportioned or allocated thereto, and a ratable part of any expenses, losses, or other deductions which cannot definitely be allocated to some item or class of gross income. The remainder, if any, shall be treated in full as taxable income from sources without the United States.

Section 1.862–1(b), Income Tax Regs., provides that the taxable income from sources without the United States shall be determined on the same basis as that used in section 1.861–8, Income Tax Regs., for determining taxable income from sources within the United States. Section 1.861–8(a) of the regulations provides in part that from the items of gross income includable in income from sources within the United States "there shall be deducted the expenses, losses, and other deductions properly apportioned or allocated thereto and a ratable part of any other expenses, losses, or deductions which cannot definitely be allocated to some item or class of gross income." The regulation further states that the "ratable part is based upon the ratio of gross income from sources within the United States to the total gross income."

On August 2, 1966, respondent published in the Federal Register (31 Fed. Reg. 10405) a proposed amendment to section 1.861–8, Income Tax Regs. These proposed regulations are entirely consistent with the existing regulations, and simply provide a more detailed explanation of the manner in which deduction items are to be allocated and apportioned among various items and classes of income. These proposed regulations have not as yet been formally adopted.[7] Consequently, they carry no more weight than a position advanced on brief

---

[6] Agent Pliskow testified that he did not rely upon sec. 482 in allocating the expenditures in question to petitioner's foreign subsidiaries. Likewise, respondent does not cite sec. 482 on brief in support of such allocation.

[7] In Treas. Dept. release F–1217 dated Apr. 15, 1968, it was announced that the proposed regulations under sec. 861 would "continue in effect under notice of proposed rule making and will be given further consideration before final action is taken thereon." Furthermore, Rev. Rul. 69–121, 1969–1 C.B. 194, states that "further consideration is being given to the proposed regulations under section 861, * * *" and "The general question of the allocation of expenses, losses, and other deductions to items of gross income is under study."

by the respondent. Nevertheless, Agent Pliskow testified that he relied upon these proposed regulations in making the allocations in question, and respondent's arguments with respect to this issue are cast in the framework of these regulations. In order to fully consider and respond to respondent's position, we find it necessary to touch upon these proposed regulations. In so doing, however, we are not to be understood as passing on, with either approval or disapproval, the merits of such regulations. We deem these proposed regulations to be tantamount to a position taken by respondent on brief, and they shall be dealt with by us accordingly.

The proposed regulations set forth one group of rules for the allocation and/or apportionment of deductions "definitely related" to one or more items of gross income, and a separate set of rules for deductions which are *not* "definitely related" to one or more income items. Subsection 1.861–8(a)(3)(i) of these proposed regulations provides that "a deduction shall be considered definitely related to one or more items or classes of gross income if it is incurred in whole or in material part as a result of, or incident to, the activities from which such gross income is derived, or if it relates to a deduction which is incurred in whole or in material part as a result of, or incident to, the activities from which such gross income is derived." Where a deduction item *is* definitely related to more than one item or class of gross income, sections 1.861–8(a)(2)(i) and 1.861–8(a)(4)(i) of the proposed regulations state that such deduction shall be allocated to all such items or classes of gross income, and, if necessary, apportioned "on a reasonable basis considering the particular characteristics of the activities producing such items or classes of gross income and the relative benefit of such activities to such items or classes of gross income." Where a deduction is *not* definitely related to any particular item or class of gross income, sections 1.861–8(a)(2)(ii) and 1.861–8(a)(4)(ii) provide that such deduction "shall be apportioned ratably among such items or classes of gross income in the same proportion that the amount of each such item or class of gross income bears to the amount of all such items or classes of gross income."

Careful consideration of the testimony of Agent Pliskow and the other evidence of record fails to convince us of the correctness of respondent's adjustments relating to the maximum foreign tax credit allowable to petitioner for taxes paid or deemed paid to England, Germany, Puerto Rico, and Cuba. In our view, this same result would obtain under either the existing or the proposed section 861 regulations. The *ratio decidendi* compelling this conclusion, as regards each of the expense items in question, is set forth in the ensuing discussion.

## A.   Deduction items allocated as being definitely related to dividends received from English and German subsidiaries

Agent Pliskow allocated a portion of various State income and franchise taxes paid by petitioner and certain foreign travel expenses incurred by two of petitioner's executive officers to the dividend income received by petitioner from its English and German subsidiaries on the basis that such expenses were definitely related thereto.

With respect to the income and franchise taxes paid by petitioner to certain States (i.e., Virginia, New Jersey, Vermont, and North Carolina), respondent argues that since for purposes of computing such taxes petitioner was required to include within its tax base the dividend income received from its English and German subsidiaries, then the increment in tax resulting therefrom should be allocated to such dividend income. Although it does appear that the inclusion of the dividend income at issue in petitioner's gross income for purposes of computing certain corporation income and franchise taxes paid by petitioner to Virginia, New Jersey, and Vermont [8] ultimately increased such taxes, the record clearly shows that any such increment was so slight as to be immaterial. Painstaking perusal of each of petitioner's State tax returns relating to the State franchise and corporation income taxes in question reveals that in every instance where the dividend income from the English and German subsidiaries was included in petitioner's tax base, such dividend income represented less than 5 percent of petitioner's gross income from all sources. Moreover, careful examination of the method employed in computing the amount of each of these State taxes fails to demonstrate how the inclusion of the dividend income at issue in making such computation could possibly result in an increment in petitioner's tax liability that would be any greater than 5 percent.[9] De minimis non curat lex. Indeed, the proposed regulations relied upon by respondent to show that the increment in State taxes is definitely related to foreign source income provide that a deduction item is definitely related to a class of income "if it is incurred in whole or in material part as a result of, or incident to, the activities from which such gross income is derived." (Emphasis

---

[8] The parties stipulated that the only dividends included in petitioner's tax base in order to compute the North Carolina tax were dividends from petitioner's Canadian subsidiary. Respondent's reference to the North Carolina taxes appears to be unintentional inasmuch as Agent Pliskow's report concludes that no adjustments are warranted with respect to the dividend income petitioner received from its Canadian subsidiary.

[9] Respondent's allocation of the State taxes in question, which is based upon figures supplied by petitioner to Agent Pliskow, shows the increment resulting from the inclusion of the dividend income at issue in the tax base to be considerably greater than 5 percent. We are uncertain as to the basis for the conflict between these figures and the computation reflected on the various State tax returns. Under any circumstances, respondent has failed to carry his burden of proof that his method of allocation was reasonable.

supplied.) In our view, respondent has failed to show that a "material part" of the State taxes involved herein are definitely related to foreign source income. We therefore conclude that such taxes are wholly related to domestic source income, thereby obviating the need for an allocation under section 862(b).

As regards the foreign travel expenses incurred by petitioner's executive officers, the record herein shows that during the years 1957 through 1959 petitioner's president and executive vice president served on the board of directors (consisting of 12 to 15 members) of petitioner's English subsidiary, and the chairman of the board of directors of the English subsidiary served on petitioner's board of directors. Petitioner had no representatives on the board of directors of the German subsidiary during this period. Petitioner's two members of the British subsidiary's board of directors did not regularly attend the meetings of the British subsidiary's board of directors. Either the president or executive vice president of petitioner would make an annual visit to England to attend the annual March stockholders meeting of the British subsidiary and would, on that visit, attend any board of directors meeting which might be held. Petitioner's president or executive vice president also occasionally attended stockholders meetings of the German subsidiary. In addition to the annual trip to England to attend the stockholders meeting of the English subsidiary, one of these executive officers would also travel to Europe in the latter part of the year and visit the English and German subsidiaries.

In support of his position that the foreign travel expenses of petitioner's president and executive vice president are definitely related to the dividends petitioner received from the English and German subsidiaries, respondent points to several instances over a 5-year period (1955–59) in which petitioner's directors or executive officers took some action or weighed the merits of certain broad policy modifications in connection with the British and German subsidiary.[10] It is evident that these two subsidiaries represented a substantial investment on the part of petitioner and we believe that the attention paid to these subsidiaries by petitioner's top executives was a normal part of their duties on behalf of petitioner. See *Columbian Rope Co.*, 42 T.C. 800, 814 (1964). Whatever activity was undertaken by petitioner's top executives in this area, including the annual trips to England and Germany, was per-

---

[10] These include a resolution adopted by petitioner's board of directors to the effect that the retirement rule for executives of the British subsidiary be applied without exception (1955) ; authorization by the board of directors for loans to be made to the German subsidiary (1957, 1958, and 1959) ; authorization by the board of directors for an increase in the capital stock of the German subsidiary (1958) ; agreements reached concerning the payment of dividends by the German subsidiary (1958, 1959) ; and a few other instances in which petitioner's top executives gave some general consideration to the desired economic trends of the foreign subsidiaries.

formed for the benefit of the petitioner, not for the foreign subsidiaries, and was in furtherance of petitioner's broad concern as a majority stockholder in the general soundness of a valuable investment.

There is an additional reason for rejecting respondent's allocation of the foreign travel expenses at issue to petitioner's dividend income. The evidence shows that it was the practice of petitioner and the foreign subsidiaries to share the overall expenses incurred on such trips, with petitioner paying for the transportation expenses and with the foreign subsidiaries paying the hotel expenses and other incidental expenses in their respective countries. In effect, petitioner has already made an apparently reasonable allocation of the total expenditures incurred by its two executives on their annual visits to England and Germany and we can perceive no reason to disturb such allocation. We note that section 1.861–8(a) (4) (i), Proposed Income Tax Regs., provides that "If a taxpayer has employed in a consistent manner a method of apportionment which is reasonable and in keeping with sound accounting practice, such method will not be disturbed."

B. *Deduction items ratably apportioned to dividend income from English and German subsidiaries as being not definitely related to any item of income*

Agent Pliskow ratably apportioned certain expenses of petitioner's executive office and various other expenses (i.e., executive officer salaries and related pension cost, cost of annual report, director's fees and expenses, cost of annual stockholders meeting, registrar and transfer fees, attorneys' fees for advice on Federal tax matters, fees for outside accounting services, and contributions) between the dividend income petitioner received from its English and German subsidiaries and petitioner's domestic source income on the ground that such deductions were *not* definitely related to any item or class of income. We must disagree. In our view, the executive office and other expenses at issue are definitely related to petitioner's domestic source income, and consequently, apportionment to foreign source income is unwarranted.

The credible testimony of petitioner's witnesses and other evidence of record convinces us that petitioner's executive officers were primarily concerned with the petitioner's extensive domestic retail operations, which included a chain of approximately 2,000 variety stores. The record herein shows that petitioner made no purchases of merchandise for its British or German subsidiaries. Nor did petitioner perform any other services or otherwise participate to any significant extent in the actual operations of these subsidiaries. The British subsidiary's internal organization for the purpose of operating its approximately 1,100 stores, was very similar to that of petitioner in the

United States, with an executive office and with several district offices. The internal structure of the various departments was also patterned after the departments in petitioner's operational structure. The German subsidiary, which operated less than 100 stores during the period here involved, was more comparable to one of petitioner's district offices in the United States, and its entire operation was conducted through a single office. As far as this record indicates both the British subsidiary and the Germany subsidiary were autonomous and operated independently of the parent corporation.

Respondent's proposed regulations provide that a deduction shall be considered definitely related to a class of income if it is incurred "in whole or in material part as a result of, or incident to, the activities from which such income is derived." If we apply this test, it clearly appears from respondent's own computations that a material part of the executive office and other expenditures in dispute was incurred in connection with petitioner's United States income. Of petitioner's total executive office and other expenses, respondent has allocated only approximately 4 percent thereof to foreign source income, with the remaining 96 percent being allocated to United States source income. These percentages indicate quite persuasively that the expenditures in question were definitely related to petitioner's domestic sources of income; *a fortiori* the need for an allocation under section 862(b) cannot arise.

## C.  *Deduction items allocated to income of Cuban and Puerto Rican branch Stores*

Respondent allocated a portion of certain domestic expenditures to the income received by petitioner from its Cuban and Puerto Rican branch operations on the basis that such deduction items were related thereto. Petitioner operated these stores in 1957, 1958, and 1959 directly under the supervision of its New York regional office and therefore allocated a portion of its executive office expenses on the same basis as such expenses were allocated by petitioner to its stores in the United States. Respondent made allocations to these stores of the executive officers' earnings and pension costs in amounts which differ slightly from the allocations already made by petitioner. Respondent also allocated to the Cuban and Puerto Rican stores a portion of petitioner's State income and franchise taxes. With respect to the Puerto Rican stores, respondent also determined that "interest expense" should be allocated to the income received from such stores for the years 1957, 1958, and 1959 in the respective amounts of $23,216.74, $18,058.37, and $53,141.86. Respondent's method for computing the allocations of the

various items to be made to the income received by petitioner from its Cuban and Puerto Rican stores is set forth in our Findings of Fact and need not be repeated here.

We do not believe that any portion of the State franchise and corporation income taxes is allocable to the Cuban and Puerto Rican stores under section 862(b) for the purpose of computing the limiting fraction on foreign tax credit under section 904. Our discussion above with respect to the allocation of such taxes to dividend income received from petitioner's British and German subsidiaries is equally applicable here. Respondent's own computations show Puerto Rican and Cuban earnings combined represent approximately 3 percent or less of the tax base used for computing the State corporation income and franchise taxes in question. It is apparent that the increment in State income and franchise taxes resulting from the inclusion of such Cuban and Puerto Rican earnings in the tax base does not constitute a "material part" of such taxes. Consequently, we conclude that these State taxes are in their entirety definitely related to domestic source income, and an allocation under section 862(b) is unwarranted.

As we have indicated, petitioner treated its Cuban and Puerto Rican stores on the same basis as the approximately 2,000 stores within the United States in allocating a portion of petitioner's executive office expense and other general expenses to such stores for services rendered. The evidence shows that the compensation of petitioner's store managers was based upon the profits generated by the individual store. It would appear therefore that the method of expenditure allocation adopted by petitioner was motivated solely by sound business considerations. It was consistently applied and there is nothing in the record to suggest that the allocations actually made by petitioner in the normal course of its business operations were unreasonable. Thus, we see no reason for disturbing the consistent and reasonable allocations already made by the petitioner. See sec. 1.861–8(a)(4)(ii), Proposed Income Tax Regs.

Respondent has also made an allocation of interest expense to the income received by petitioner from its Puerto Rican stores. Agent Pliskow's reasons for making this adjustment may be summarized as follows: (1) Petitioner, in inaugurating operations in Puerto Rico in 1957 and continuing into 1958 and 1959, supplied the Puerto Rican operation with inventory, cash, and fixed assets; (2) petitioner did not charge its Puerto Rican stores for these advances; (3) during this period petitioner was borrowing money at 5-percent interest; and (4) it was, consequently, necessary to make an allocation to income from Puerto Rican stores representing an interest charge which was com-

puted at 5 percent of the net advances made by petitioner to its Puerto Rican operations. From testimony given by Agent Pliskow before this Court, it is clear that respondent does *not* rely upon either section 482 or section 483 [11] as authority for this interest expense allocation, but instead relies solely upon section 862(b) and the applicable underlying regulations in support thereof.

In a memorandum report submitted to the audit division of the Internal Revenue Service, Agent Pliskow particularly relies upon the proposed regulations under section 861 for the proposition that the interest expense item at issue is definitely related to the gross income earned by petitioner's Puerto Rican branch. To sustain this position, it was incumbent upon the respondent to show by a preponderance of the evidence that such interest expense was incurred as a result of, or incident to, the income-producing activities of the Puerto Rican branch operation. Sec. 1.861–8(a)(3)(i), Proposed Income Tax Regs. We conclude that respondent has failed to carry his burden of proof with respect to this item. He has not introduced any evidence that the money borrowed by petitioner at the rate of 5 percent during this period was in any way connected with the Puerto Rican stores. Indeed, Agent Pliskow frankly admitted that he was unable to link any specific borrowings by petitioner to the advances made to the Puerto Rican branch or otherwise to the income-producing activities of that branch. Thus, in our view respondent has failed to establish a sufficient nexus between the interest expense item and the income earned by the Puerto Rican stores that would warrant an allocation under section 862(b).

Respondent cites *Erich O. Grunebaum*, *supra;* *South Porto Rico Sugar Co.*, 2 T.C. 738 (1943); and *International Standard Electric Corporation*, 1 T.C. 1153 (1943), affirmed on this issue 144 F. 2d 487 (C.A. 2, 1944), to support the allocation of petitioner's expenditures to the income received from the foreign subsidiaries. We find these cases to be readily distinguishable on their facts. In the above-cited cases, the deduction items in question were not definitely related to any item or class of income, and therefore, were properly apportioned between domestic and foreign source income. In contrast, in the instant case the deductions at issue are definitely related to petitioner's domestic source income, thereby obviating any need for an allocation between domestic and foreign source income.

In view of the foregoing, we hold that the allocations made by respondent are not required under section 862(b) and the applicable

---

[11] Sec. 483, I.R.C. 1954, which in effect imputes interest where a deferred-payment contract for the sale or exchange of property fails to provide therefor, does not appear to be applicable, and in any event, was not in effect during the years involved herein.

regulations, and consequently, petitioner's computation of the per country limitation for foreign tax credit purposes is hereby sustained. Accordingly,

*Decisions will be entered under Rule 50.*