JERRY E. SMITH, Circuit Judge:
There is only one issue in this case: When an employer withdraws from a multi-employer health insurance plan and establishes a new health plan for its remaining employees, who must continue to provide the health insurance mandated by COBRA to the qualifying employees of the withdrawing employer? The district court held that the multi-employer plan remains responsible for the COBRA-qualified employees. Finding this conclusion consistent with the plain language of the statute and coherent policy goals, we affirm.
I.
This matter involves an issue of first impression concerning coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 (“COBRA”), 29 U.S.C. § 1161 et seq. *971 (“COBRA”).[1] The issue was submitted to the district court on cross-motions for summary judgment on an uncontroverted record. Accordingly the facts set forth below are undisputed.
Defendant-appellee AppleTree Markets, Inc. (“AppleTree”), a supermarket chain, is an employer that, pursuant to a collective bargaining agreement, provided health benefits to its employees through plaintiff, a mul-ti-employer health plan known as South Central United Food & Commercial Workers Unions and Employers Health & Welfare Trust (“UFCW’). UFCW is a multi-employer employee welfare benefit plan for the purposes of ERISA, 29 U.S.C. § 1002(1), providing health and medical benefits to employees in the retail food industry. UFCW is funded through contributions from participating employers; AppleTree became a participating employer in the plan in June 1988 and thereafter contributed to UFCW monthly.
In January 1992, AppleTree filed for bankruptcy under chapter 11 of the Bankruptcy Code. In the course of its bankruptcy proceedings, AppleTree obtained court approval to shed its collective bargaining agreements. As a result of the termination of the agreements, UFCW withdrew AppleTree’s membership in the plan when no agreement could be reached on AppleTree’s prospective contribution rate to the plan.
AppleTree established its own group health plan as of September 1,1992, covering only employees active at that time but not its former employees receiving coverage from UFCW under COBRA. In other words, Ap-pleTree withdrew its active employees from the UFCW plan but left behind its COBRA insureds.
UFCW sued, claiming that AppleTree had an obligation under COBRA to extend coverage under its new plan to its former employees now receiving benefits from UFCW under COBRA. AppleTree contended that UFCW was obligated to extend the COBRA benefits. Neither party disputes that the former employees are entitled to COBRA benefits: The disagreement is whether UFCW or AppleTree should provide it.
Relying upon the plain language of COBRA, the district court granted summary judgment to AppleTree, holding that § 29 U.S.C. § 1161(a) defines UFCW as the sponsor of the plan that therefore is responsible for the coverage. We affirm.
II.
We review a grant of summary judgment de novo. Hanks v. Transcontinental Gas Pipe Line Corp., 953 F.2d 996, 997 (5th Cir.1992). Summary judgment is appropriate “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c). Here, our task is made simpler because the facts are undisputed and we deal almost exclusively with a question of statutory interpretation.
III.
A.
Section 1161(a) reads as follows:
The plan sponsor of each group health plan shall provide, in accordance with this part, that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying even is entitled, under the plan, to elect, within the election period, continuation coverage under the plan.
Thus, the plan sponsor of a group health plan must offer continuation coverage to employees, their spouses, and dependents who become qualified for such coverage while covered by the plan, and that coverage is to be provided under the plan in which the beneficiary participated at the time the qualifying event[2] occurred. See id.; 29 U.S.C. § 1167.
COBRA defines the “plan sponsor” as
*972 (i) the employer in the case of an employee benefit plan established or maintained by a single employer, ... or (iii) in the case of a plan established or maintained by two or more employers or jointly by one or more employers and one or more employee organizations, the association, committee, joint board of trustees, or other similar group of representatives of the parties who establish or maintain the plan.
29 U.S.C. § 1002(16)(B). The UFCW plan was a multi-employer, “joint” plan. Under the plain language of the statute, the “association, committee, joint board, or other similar group of representatives” of UFCW is the plan sponsor. Therefore, under § 1161(a), UFCW, not AppleTree, is responsible for providing continuation coverage to the COBRA employees.
Once the statutory relationship is established, it can be terminated only for one of the reasons enumerated in 29 U.S.C. § 1162(2). UFCW has not alleged that any of the events listed in § 1162(2) has occurred; therefore, there is no legal basis for UFCW to terminate coverage of these COBRA employees.
B.
1.
UFCW contends, however, that this case is controlled by 29 U.S.C. § 1162(1), defining “continuation coverage,” and not by § 1161(a). Section 1162(1) provides:
The coverage must consist of coverage which, as of the time the coverage is being provided, is identical to the coverage provided under the plan to similarly situated beneficiaries under the plan with respect to whom a qualifying even has not occurred. If coverage is modified under the plan for any group of similarly situated beneficiaries, such coverage shall also be modified in the same manner for all individuals who are qualified beneficiaries under the plan pursuant to this part in connection with such group.
UFCW claims that § 1162(1) requires an employer that modifies health coverage for its employees by transferring them from one plan to another, but does not terminate all of its health plans, to transfer coverage for all COBRA-qualified beneficiaries as well. According to UFCW, “similarly situated beneficiaries” are AppleTree’s active employees and their dependents who have not experienced a COBRA-qualifying event. Further, when the active employees’ “coverage” was “modified,” the COBRA beneficiaries coverage must be changed identically.
UFCW’s reading of the statute is strained and insupportable by the language of § 1162(1). A natural reading of § 1162(1) reveals an intent to forbid plan sponsors from discriminating between COBRA and active employees within a given plan.
There is no support for UFCW’s position that a discrete movement from one plan to another can qualify as a modification of coverage under the original plan. The statute refers to a modification of coverage under the plan. This implication that the statute is intended to prevent discrimination within a single plan cannot reasonably be read to extend to those participating in a separate plan.
Thus, § 1162(1) does not apply to this case and would become relevant only if UFCW modified coverage to active employees participating in its plan. If so, § 1162(1) would require it to modify similarly the benefits of beneficiaries of continuation coverage. Nothing in § 1162(1) requires an entity that has never previously sponsored health care coverage for an individual to provide continuation coverage to him simply because it later gives coverage to others.
2.
UFCW relies upon proposed Treasury Department regulations to buttress its claim that “modification” includes elimination of coverage for similarly situated employees. The authority of proposed regulations has not been addressed by this circuit.
UFCW relies upon district court opinions holding that proposed regulations are entitled to “great judicial deference.” See Swint v. Protective Life Ins. Co., 779 F.Supp. 532, 554 (S.D.Ala.1991); Johnson v. Reserve Life Ins. Co., 765 F.Supp. 1478, 1480-82 (C.D.Cal.1991). AppleTree argues that a proposed *973 regulation has no force or effect until it becomes final. See Oakley v. City of Longmont, 890 F.2d 1128, 1133 (10th Cir.1989), cert. denied, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990). Thus, proposed regulations are not entitled to judicial deference and carry no more weight than a position advanced in a brief by one of the parties. See Natomas N. Am., Inc. v. Commissioner, 90 T.C. 710, 718 n. 11, 1988 WL 33539 (1988); F.W. Woolworth Co. v. Commissioner, 54 T.C. 1233, 1265-1266, 1970 WL 2405 (1970). We agree with AppleTree and hold that proposed regulations are entitled to no deference until final.
Our view accords with other circuits that have considered the question. In Oakley, 890 F.2d at 1133, the Tenth Circuit noted that “[u]ntil the agency completes formal rule-making and promulgates final regulations, the proposed rules, which the Internal Revenue Service has already deemed interpretive regulations, are unpersuasive.” Similarly, when presented with proposed regulations from the Securities and Exchange Commission, the Fourth Circuit refused to consider their effect, noting that the “regulations are not in effect and we do not know when, if ever, they will become effective.” Telvest, Inc. v. Bradshaw, 618 F.2d 1029, 1036 n. 10 (4th Cir.1980).
To give effect to regulations that have merely been proposed would upset the balance of powers among the constitutional branches. Deference is due the Executive when Congress delegates “authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.” Chevron U.S.A Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (emphasis added).
The Chevron doctrine is based upon separation of powers: As Justice Stevens’s use of the term “legislative regulations” suggests, Congress is delegating to the Executive Branch authority to act in an essentially legislative manner to fill the interstices of the statute. “The power of an administrative agency to administer a congressionally created ... program necessarily requires the for-, mulation of policy and the making of rules to' fill any gap left, implicitly or explicitly, by Congress.” Id. at 843, 104 S.Ct. at 2782 (quoting Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974)).
In effect, statutory ambiguity cedes legislative authority to the Executive. The Executive Branch need not promulgate rules that best mirror legislative intent; its rules only need not be arbitrary or capricious. Absent executive rulemaking,, it remains the duty of courts to construe the statute in order to divine congressional intent. In other words, if final executive regulations interpreting an ambiguous statute are promulgated, then the Executive is the “gap-filling” institution; if there is no authoritative statement from the Executive, the courts “fill the gap” by attempting to divine congressional intent.
Once it is recognized that Executive rule-making is actually interstitial legislation, it becomes inappropriate to defer to proposed regulations, as that would upset the constitutional balance of power among the branches in the same manner as would deference to laws considered but not enacted by Congress.
C.
UFCW argues that by contributing to the plan, AppleTree “established and maintained” the plan within the language of 29 U.S.C. § 1002(16)(B). Thus, when Apple-Tree quit contributing to the plan, UFCW no longer was the plan sponsor as to these individuals. Under this reading, the plan sponsor changes as members enter and exit the plan. The statute indicates, however, that multi-employer plans have only one sponsor, the joint board of trustees. Membership changes in the plan do not affect this definitional fact.
Furthermore, once the UFCW board became the plan sponsor, it could not be relieved of this duty until the occurrence of an event listed in § 1162(2). UFCW. admits that it was the plan sponsor for at least the time that AppleTree contributed to the plan; from then on it remained the plan sponsor, as nothing in § 1162(2) permits a plan spon *974 sor of a multi-employer plan to terminate its COBRA obligation to qualified individuals because a participating employer subsequently sponsors its own plan for other covered persons.
IV.
UFCW contends that adopting Apple-Tree’s reading of the statute would lead to an inequitable result and therefore should be eschewed. UFCW argues that allowing AppleTree to relieve itself of responsibility for the COBRA beneficiaries would create an “adverse selection” problem allowing Apple-Tree to foist poor-risk COBRA beneficiaries onto the plan, while retaining the good risks in its new plan.
An adverse selection problem arises because even though the COBRA beneficiaries continue to pay premiums, the amount they can be charged is limited by law. Moreover, the plan cannot condition the availability of COBRA coverage on evidence of insurability. See 29 U.S.C. § 1162(4); 26 U.S.C. § 4980B(f)(2)(C). As a result, “Former employees choose continuation coverage only when that is cheaper than insurance at market prices.” Herrmann v. Cencom Cable Assocs., 978 F.2d 978, 979 (7th Cir.1992). “[FJormer employees would like to treat continuation coverage as an option, to be exercised only if they are sure that they face medical costs exceeding the premiums. If they turn out to be healthy, they do not enroll and pay nothing. If medical needs loom, they exercise their option.” Id. Because COBRA-qualified beneficiaries rationally will elect coverage only if their premiums will be less than their benefits, the remaining members of the plan subsidize their benefits. In turn, employers would prefer to provide coverage only for good risks, rather than subsidizing the COBRA-qualified bad risks as well.
Allowing AppleTree to abandon coverage of its COBRA-qualified ex-employees allows it to bring only the good risks within its new plan, while leaving the bad risks in the UFCW plan. UFCW contends that this result is inequitable and contrary to eongres-sional intent. UFCW claims that it is more equitable to require AppleTree to subsidize its poor risks, rather than having the remaining plan members subsidize them. Thus, we should ignore the plain language of the statute and force AppleTree to cover the COBRA beneficiaries.
We reject the UFCWs argument for two reasons. First, to ignore the plain language of the statute would be to substitute improperly our own policy predilections for the express intent of Congress. Second, coherent and sensible policies undergird the plain language of the statute.
A.
The allegedly inequitable result the plain language of § 1161(a) commands results from Congress’s caps on rates and its forbidding conditioning of availability on evidence of insurability, not from the statutory definition of “plan sponsor.” If the plan could charge the market price for insuring these high-risk individuals, there would be no adverse selection problem.
UFCW would have us accept the price caps as given and define the term “plan sponsor” to account for the side-effects of the caps. We could as easily accept § 1161(a)’s definition of plan sponsor, and then declare the price caps invalid as inequitable. There is no more ground for ignoring the statutory definition of “plan sponsor” than for ignoring the rate caps or the ban on evidence of insurability.
UFCW has cited no evidence that Congress was aware that its price regulation created an adverse selection process or that Congress intended to rectify the problem by requiring courts deliberately to misread § 1161(a). We can avoid the unintended consequences spawned by COBRA’s price caps only be eviscerating § 1161(a). Correcting the ill effects of price caps by choosing which provisions in ERISA’s “complex and highly technical regulatory program”[3] will be given effect is the duty of Congress, not the judiciary. Such a course invites us to substitute our policy preferences for those reflected in the language of the statute. We reject this *975 invitation and construe § 1161(a) according to its plain meaning.
B.
If we examine the policies underlying the statutory language, we must reject UFCW’s classification of them as absurd or inequitable. Multi-employer benefit plans such as UFCW are concerned that participants such as AppleTree will exit the plan, leaving the high risk employees behind. But the coverage agreement between the employer and the plan is a voluntarily-bargained document; thus, the agreement can provide for this concern. Since all elements of the agreement between the plan and an employer are freely negotiated at the time of joining the plan, the parties can allocate this risk.
Indeed, establishing actuarial risk is easier as the size of the participant pool grows. Thus, there are strong countervailing forces providing AppleTree with incentives to remain in the program. For smaller employers, these pressures to remain in a multi-employer plan are even stronger. In fact, multi-employer plans can refuse to admit prospective members who are unable to pay their way.
The statutory solution to a loss of revenue because of a withdrawal of participants is not to terminate coverage for some, as UFCW attempted to do here. Rather, if revenue falls because of defections, § 1162(1) requires the joint board to change coverage for all participants, not to terminate coverage for some while retaining full coverage for others.
Finally, we reject UFCW’s premise that it is somehow more “equitable” for AppleTree than for the other UFCW plan members to subsidize coverage for the COBRA beneficiaries. When UFCW. became the plan sponsor, it assumed responsibility for these beneficiaries. It is not inequitable to hold it to its statutory responsibilities.
V.
Giving the statutory language its plain meaning and construing it in light of reasonable congressional policy goals, we conclude that AppleTree is entitled to judgment as a matter of law. Therefore, we AFFIRM the district court’s grant of summary judgment.

. Although COBRA is referred to by its own name, it is technically a set of amendments to the Employee Retirement Income Security Act of 1974 ("ERISA”), 29 U.S.C. § 1001 et seq.

. "Qualifying events" include, among other things, the death, termination, or divorce of a covered employee. See 29 U.S.C. § 1163.

. Meredith v. Time Ins. Co., 980 F.2d 352, 357 (5th Cir.1993).