**John C. ZINNIEL and Gayle A. Zinniel, David N. Merryfield and Jane A. Merryfield, James G. Samuels and Margaret Samuels, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 88–1531.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1988.

Decided Sept. 6, 1989.

Rehearing and Rehearing En Banc Denied Oct. 18, 1989.

Eugene O. Duffy, Linda E. Mosakowski, Randall L. Nash, O'Neil Cannon & Hollman, Milwaukee, Wis., for petitioners-appellants.

William F. Nelson, I.R.S., Washington, D.C., for C.I.R.

Before CUDAHY and RIPPLE, Circuit Judges, and WILL, Senior District Judge.*

---

* The Honorable Hubert L. Will, Senior United States District Judge for the Northern District of Illinois, is sitting by designation.

RIPPLE, Circuit Judge.

This is an appeal from the Tax Court's denial of the appellants' motion for litigation costs. On June 6, 1984, the Commissioner of Internal Revenue (Commissioner) issued a notice of tax deficiency to the appellants. The appellants filed timely petitions in the Tax Court for the redetermination of the deficiencies. The Tax Court then ruled in favor of the taxpayers. On September 28, 1987, the appellants filed a motion for litigation costs pursuant to 26 U.S.C. § 7430 (now amended).[1] The Tax Court denied this motion on December 8, 1987. The appellants now appeal that denial. We conclude that the Commissioner's position in issuing a deficiency against the appellants was not unreasonable and affirm the order of the Tax Court.

# I

## BACKGROUND

### A. *Introduction*

The appellants, John C. Zinniel and Gayle A. Zinniel, David N. Merryfield and Jane A. Merryfield, and James G. Samuels and Margaret Samuels are the taxpayers in this action (collectively taxpayers). The underlying action from which the taxpayers seek litigation costs dealt with whether a Subchapter S election for the taxpayers' corporation, Sierra Limited, had been properly terminated under the statute then governing such terminations, 26 U.S.C. § 1372(e)(1), and the proposed regulations thereunder.[2] The Commissioner contended that, in order to terminate properly a Sub-

chapter S election, section 1372(e)(1) required new shareholders to file a document with the Internal Revenue Service (IRS) indicating that the shareholders refused to consent to the election. The taxpayers' position was that section 1372(e)(1) only required that the "refusal to consent" document be filed with the corporation. The Tax Court rejected the Commissioner's argument and held in favor of the taxpayers. *Zinniel v. Commissioner,* 89 T.C. 357 (1987). Having prevailed on the merits, the taxpayers filed a motion requesting that the Commissioner pay reasonable litigation costs incurred by the taxpayers in that action pursuant to 26 U.S.C. § 7430.

### B. *The Underlying Transaction*

Sierra Limited (Sierra) is a Wisconsin corporation that was incorporated in 1976. At the time of incorporation, John Zinniel, David Merryfield, and James Samuels each owned one-third of the outstanding 900 shares of stock in Sierra. Sierra made an election to be taxed as a Subchapter S corporation. The election was first effective for Sierra's taxable year ending March 31, 1977. During 1977, Sierra decided that it would adopt a qualified pension plan. Because such a plan could not be established while Sierra was still an S corporation, it was necessary to terminate the S corporation status.

Prior to 1976, section 1372(e)(1) required new shareholders to consent affirmatively to the corporation's Subchapter S election within the time prescribed by the Secretary's regulations.[3] Inaction meant the S corporation status terminated. This ar-

---

1. While section 2 of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085 (1986), redesignated the Internal Revenue Code of 1954 as the Internal Revenue Code of 1986, the taxable years and the significant underlying events in the present case antedate the Tax Reform Act of 1986. Unless otherwise noted, all references to the tax code in the underlying action will be to the Internal Revenue Code of 1954.

2. Because the underlying events occurred during 1976 and 1977, we must look at the statutory language then governing terminations of Subchapter S elections. At that time, section 1372 was titled "Election by Small Business Corporation." The statutory language governing elections and terminations of Subchapter S status

was revised in a general revision of the Subchapter S provisions. *See* Subchapter S Revision Act of 1982, Pub.L. No. 97–354, 96 Stat. 1669 (1982). The current provision governing the election and termination of Subchapter S status is now codified at 26 U.S.C. § 1362. The current section appearing at 26 U.S.C. § 1372 (titled "Partnership rules to apply for fringe benefit purposes") has no bearing on this case.

3. The termination provision was amended on October 4, 1976. Prior to that amendment, the language in section 1372(e)(1) read as follows:

(e) Termination.—
(1) New shareholders.—An election under subsection (a) made by a small business corpo-

rangement resulted in the inadvertent termination of Subchapter S elections when new shareholders failed to file this statement of affirmative consent. Therefore, on October 4, 1976, Congress amended section 1372(e)(1) to require that a new shareholder must refuse affirmatively the Subchapter S election.[4] Inaction meant the S corporation status remained.

Upon consultation with counsel, the taxpayers were advised that the termination of a Subchapter S election could be effected by

a gift of $3,000.00 worth of stock to each spouse of present stockholders and they, in turn, will file a notification with the Internal Revenue Service that they do

not consent to be treated as stockholders in a Subchapter S Corporation.

Appellee's Br. at 4.[5] Therefore, on November 30, 1977, each of the three Sierra shareholders transferred thirty shares of Sierra stock to his wife. At that time, a document entitled "Refusal to Consent to Small Business Corporation Election" (Refusal to Consent) was executed by the wives and submitted to Sierra. It stated that the wives would not consent to Sierra's being treated as a small business corporation under section 1372 of the Internal Revenue Code (Code). This document—the focus of this litigation—was not filed with the IRS within the sixty-day period allowed by the statute for making such a refusal.

---

ration shall terminate if any person who was not a shareholder in such corporation—

    (A) on the first day of the first taxable year of the corporation for which the election is effective, if such election is made on or before such first day, or

    (B) on the day on which the election is made, if such election is made after such first day,

*becomes a shareholder in such corporation and does not consent to such election* within such time as the Secretary or his delegate shall prescribe by regulations. Such termination shall be effective for the taxable year of the corporation in which such person becomes a shareholder in the corporation and for all succeeding taxable years of the corporation.

Pub.L. No. 85–866, § 64(a), 72 Stat. 1606, 1651 (1958) (emphasis added).

**4.** The revised language, effective for tax years beginning after December 31, 1976, read as follows:

    (e) Termination.—

    (1) New Shareholders.—

    (A) An election under subsection (a) made by a small business corporation shall terminate if any person who was not a shareholder in such corporation—

    (i) on the first day of the first taxable year of the corporation for which the election is effective, if such election is made on or before such first day, or

    (ii) on the day on which the election is made, if such election is made after such first day,

*becomes a shareholder in such corporation and affirmatively refuses* (in such manner as the Secretary shall by regulations prescribe) *to consent to such election* on or before the 60th day after the day on which he acquires the stock.

    (B) If the person acquiring the stock is the estate of a decedent, the period under subpar-

agraph (A) for affirmatively refusing to consent to the election shall expire on the 60th day after whichever of the following is the earlier:

    (i) The day on which the executor or administrator of the estate qualifies; or

    (ii) The last day of the taxable year of the corporation in which the decedent died.

    (C) Any termination of an election under subparagraph (A) by reason of the affirmative refusal of any person to consent to such election shall be effective for the taxable year of the corporation in which such person becomes a shareholder in the corporation and for all succeeding taxable years of the corporation.

Pub.L. No. 94–455, § 902(c)(3), 90 Stat. 1520, 1609 (1976) (emphasis added).

**5.** The taxpayers' legal advisor, Patrick O'Neil, gave his clients this advice in a letter dated June 20, 1977. R.19 at Ex. 13–M. In November 1977, Mr. O'Neil requested of Attorney Russell Brannen that he further investigate the method to terminate a Subchapter S election under the new laws. Mr. Brannen then contacted the IRS on a number of different occasions seeking advice. In response to his inquiries, Mr. Brannen was informed by the IRS that "regulations had not yet been proposed or adopted." R.19 at ¶ 19. It is clear that, by contacting the IRS, the taxpayers made a good-faith attempt to properly file a termination of Sierra's Subchapter S status. However, there is no evidence that the IRS affirmatively misrepresented the Commissioner's position—saying only that no regulations had been proposed or adopted—and the parties themselves stipulated that "Mr. O'Neil, who is an experienced tax practitioner and is familiar with the law regarding the termination of and consents regarding elections of Subchapter S corporations, assumed that the Internal Revenue Service would have to be notified in writing of such refusal to consent to said election." R.19 at ¶ 15.

On the same date, November 30, 1977, a Form 5301—Application for Determination for Defined Contribution Plan—was filed with the IRS. This form recited that Sierra was a *corporation*, not an S corporation. The IRS issued a favorable determination letter regarding the qualified status of Sierra's employee pension plan.

Sierra filed its income tax return on March 31, 1978 and attached a letter stating that Sierra's status as an S corporation had terminated when the new shareholders had affirmatively refused to consent to the election. The Refusal to Consent was not attached to the letter. At the request of the IRS, on December 28, 1978, Sierra's accountant forwarded to the IRS the Refusal to Consent.

For the years ending March 31, 1978 and March 31, 1979, Sierra reported its taxable income as if it were a corporation. The parties stipulated that, at all times relevant to this controversy, there were no regulations, letter rulings, or revenue procedures regarding the new method for terminating a Subchapter S election. R. 19 at 9. Each of the three couples also reported their income and any earnings from Sierra as if Sierra were a corporation. On April 17, 1980, Proposed Treasury Regulation 1.1372–3(b)(3) was published under Code section 1372(e)(1).[6] This section set forth the requirements for revoking an election as a Subchapter S corporation.

## C. *The Underlying Litigation*

The Commissioner subsequently determined that Sierra's Subchapter S election had not been terminated effectively, and that taxpayers were therefore required to report on their income tax returns for the taxable years in issue the difference between the amount they paid (assuming that Sierra was a corporation) and the amount they owed because the company was still deemed by the IRS to be an S corporation. The Commissioner issued statutory notices of deficiency dated June 6, 1984 that determined deficiencies in taxpayers' income taxes for the taxable years ending December 31, 1978 and December 31, 1979.

Taxpayers filed timely notices for review of these deficiencies by the Tax Court. They claimed that the new shareholders affirmatively had refused to consent to the Subchapter S election by filing the refusal to consent with Sierra within sixty days of the new shareholders' acquisition of the stock. Taxpayers claimed that the plain language of the statute did not require them to file this refusal to consent—or any other documentation—with the IRS. There were no regulations in force requiring a filing with the IRS. In the alternative, taxpayers argued that the Proposed Treasury Regulation [7] cured any defect in the manner of the election. The Commissioner countered by arguing that, since taxpayers had not filed their refusal to consent with the IRS, no effective termination of the Subchapter S election had occurred. In the Commissioner's view, this result was required by the statute, section 1372(e)(1), even without regulatory supplementation.

The Tax Court decided in favor of the taxpayers. It held that the plain wording of the statute does not require that new shareholders file an affirmative refusal to consent to a corporation's Subchapter S election. Nor could it find that the legislative history reflects an unequivocal congressional intention to require that the affirmative refusal to consent be filed with the IRS in order to effectuate termination. Finally, it held that the proposed regula-

---

**6.** Proposed Treasury Regulation § 1.1372–3(b)(3) provided as follows:

(3) *Prior Defective Affirmative Refusals to Consent.* A timely defective affirmative refusal to consent filed by a shareholder with the Internal Revenue Service prior to [the date which is 30 days after the date on which these regulations are published in the Federal Register as a Treasury Decision] will be considered effective by the Internal Revenue Service if the names of both the shareholder and the corporation are set forth in the statement of affirmative refusal to consent. For this purpose, a defective affirmative refusal to consent is one that was not properly filed or did not contain all the information required by paragraph (b)(1)(i) or (2) (as the case may be) of this section.

45 Fed.Reg. 26,092, 26,097 (1980) (proposed April 17, 1980).

**7.** *See supra* note 6.

tions " 'carry no more weight than a position advanced on brief.' " *Zinniel v. Commissioner,* 89 T.C. at 369 (quoting *F.W. Woolworth Co. v. Commissioner,* 54 T.C. 1233, 1265 (1970)); *see also LeCroy Research Sys. Corp. v. Commissioner,* 751 F.2d 123, 127 (2d Cir.1984) ("Proposed regulations are suggestions made for comment; they modify nothing.").

D. *Request for Litigation Costs Pursuant to Section 7430*

Taxpayers, alleging that they satisfied the requirements of 26 U.S.C. § 7430—having *substantially prevailed* with respect to the amount in controversy and claiming that the *government's position* in the suit *was unreasonable* —filed a motion for litigation costs under 26 U.S.C. § 7430. The Tax Court denied the motion. It held that taxpayers had not established that the position of the government was unreasonable. *Zinniel v. Commissioner,* No. 31100–84, mem. sur order at 4 (T.C. Dec. 8, 1987); R. 33 at 4 [hereinafter Mem. sur order]. In the Tax Court's view, the issue involved a complex analysis of section 1372(e)(1) and its legislative history. Consequently, although the Tax Court disagreed with the Commissioner, it did not think that the Commissioner's position was unreasonable in light of what he knew at the time of the litigation. The Tax Court thus held that taxpayers had not satisfied their burden of proving that the position of the government was unreasonable. The taxpayers now appeal.

## II

## ANALYSIS

A. *Standard of Review*

As the appellants point out, a survey of the case law reflects a split among the circuits on the appellate standard of review of cost determinations under section 7430. The Eighth Circuit has held that a denial of costs and fees under section 7430 is reviewed under the "abuse of discretion" standard. *Berks v. United States,* 825 F.2d 1262 (8th Cir.1987), *remanded for findings, later appeal,* 860 F.2d 841 (8th

Cir.1988). In contrast, the Ninth Circuit has recently concluded that the Tax Court's determination of the reasonableness of the Commissioner's position under section 7430 presents a mixed question of law and fact, and is subject to *de novo* review. *Sliwa v. Commissioner,* 839 F.2d 602, 605 (9th Cir. 1988). In *Harrison v. Commissioner,* 854 F.2d 263 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1313, 103 L.Ed.2d 582 (1989), we analyzed a question under section 7430 but did not explicitly articulate the standard of review.

In our view, the decision of the Supreme Court of the United States in *Pierce v. Underwood,* —— U.S. ——, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), now provides definitive guidance on the issue. At issue was an award of attorney's fees under the Equal Access to Justice Act (EAJA). *See* 28 U.S.C. § 2412(d). In *Pierce,* the Supreme Court squarely held that a district court's determination that a department head's position was not "substantially justified," was reviewable under the abuse of discretion standard. In reaching that conclusion, the Court first noted that the language of the EAJA suggested such a result because it required a fees award "unless the court finds that" (rather than simply "unless") the United States' position was substantially justified. The Court also noted that " 'as a matter of the sound administration of justice,' " 108 S.Ct. at 2547 (quoting *Miller v. Fenton,* 474 U.S. 104, 114, 106 S.Ct. 445, 451, 88 L.Ed.2d 405 (1985)), a deferential standard of review was preferable. The Court stated that:

> the question [of fees] will turn upon not merely what was the law, but what was the evidence regarding the facts. By reason of settlement conferences and other pretrial activities, the district court may have insights not conveyed by the record, into such matters as whether particular evidence was worthy of being relied upon, or whether critical facts could easily have been verified by the Government. Moreover, even where the district judge's full knowledge of the factual setting can be acquired by the appellate court, that acquisition will often come at unusual expense, requiring the court to

undertake the unaccustomed task of reviewing the entire record, not just to determine whether there existed the usual minimum support for the merits determination made by the fact-finder below, but to determine whether urging of the opposite merits determination was substantially justified. *Id.* Even when the fees determination is based upon the evaluation of a purely legal issue governing the litigation, continued the Court, *de novo* review will not be time well spent. "[T]he investment of appellate energy will either fail to produce the normal law-clarifying benefits that come from an appellate decision on a question of law, or else will strangely distort the appellate process." *Id.* 108 S.Ct. at 2548. Finally, noted the Court, application of an abuse of discretion standard will permit the "needed flexibility," *id.* at 2549, in dealing with "such a multifarious and novel question, little susceptible ... of useful generalization." *Id.* at 2548.

■ We believe that the same considerations that the Supreme Court found con-trolling in the EAJA situation also should be controlling with respect to section 7430. This section authorizes, rather than commands, the court to make an award—"the prevailing party may be awarded a judgment"—for reasonable litigation costs. 26 U.S.C. § 7430(a); *see Feinberg v. United States,* 628 F.Supp. 12, 13 (E.D.Pa.1985); *Randazzo v. United States Dep't of Treasury,* 581 F.Supp. 1235, 1236 (W.D.Pa. 1984), *appeal dismissed,* 751 F.2d 145 (3d Cir.1984). Moreover, the same considerations of judicial economy present in the EAJA situation are also present in the section 7430 context. *Cf. Mars Steel Corp. v. Continental Bank N.A.,* 880 F.2d 928, 933–35 (7th Cir.1989) (en banc) (applying the same consideration to the appellate review of sanctions under Rule 11). Accordingly, we must conclude that the determination of the Tax Court is reviewable under an abuse of discretion standard.

### B. *The Merits*

Having addressed the only threshold issue properly before us,[8] we must now de-

---

8. There is another potential threshold issue in litigation of this sort. As we noted in *Harrison v. Commissioner,* 854 F.2d 263, 265 n. 3 (7th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1313, 103 L.Ed.2d 582 (1989), the circuits are divided on whether, in making a determination under section 7430, a court ought to consider only the government's in-court litigating position or whether it ought to consider the government's administrative position prior to the litigation as well. As we noted in *Harrison,* this circuit has not yet been confronted with a situation in which it has been necessary for us to confront squarely the question. Moreover, for cases commencing after December 31, 1985, Congress has settled the issue by providing that the administrative position of the government can be considered. Tax Reform Act of 1986, Pub.L. No. 99–514, § 1551(a)–(g), 100 Stat. 2085, 2752, 2753 (1986) (later amended and codified as 26 U.S.C. § 7430(c)(7)).

In this case, we need not determine whether, for cases commencing before January 1, 1986, the administrative position of the government ought to be considered. In dealing with the submission of the taxpayers on their motion for litigation costs, the Tax Court noted that:

Petitioners' motion only states that respondent's "position and actions" were unreasonable "in that the Respondent took the position that the new shareholders must file an affirmative refusal to consent ... with the ... Service in order to terminate the ... Sub–Chap-ter S Election." Petitioners then set forth 14 numbered paragraphs that petitioners represent to be the facts supporting the statement. Some of the paragraphs contain petitioners' legal conclusions and facts not in evidence, while other paragraphs contain facts that do not support petitioners' statement with respect to respondent's position. As we read petitioners' motion, the crux of petitioners' argument is that respondent's position was unreasonable because it was without any basis in law, and it is that argument that we specifically address in the text above.

Petitioners' Memorandum in Support of Litigation Costs, which was filed subsequent to petitioners' Motion for Litigation Costs, has been considered and does not raise any new or meritorious arguments with respect to this issue.

*Zinniel v. Commissioner,* No. 31100–84, mem. sur order at 5–6 n. 7 (T.C. Dec. 8, 1987); R.33 at 5–6 n. 7. Although the taxpayers repeat in this court a good deal of the administrative history of the litigation, they do not take specific issue with the Tax Court's characterization of their motion. Nor do they address squarely the conflict among the circuits and argue that we ought to adopt the position of those circuits that have considered the government's administrative position. They only suggest that we ought to consider "all the facts and circumstances surrounding the proceeding." Appellants' Br. at 10 (quoting *In re Testimony of Arthur Andersen & Co.,*

termine whether the Tax Court abused its discretion when it denied litigation costs to the taxpayers.

### 1.

We begin by reviewing the requirements of the statute permitting the award of fees. There appears to be no dispute between the parties with respect to the essential requirements of section 7430. There are three elements that taxpayers must satisfy before they may recover litigation costs. First, taxpayers must exhaust all administrative remedies available to them. The parties agree that the taxpayers met this first requirement. Second, taxpayers must show that they are the "prevailing party" as that term is defined in section 7430(c)(2): taxpayers must prove that they substantially prevailed with respect to the amount in controversy and that the position of the United States in the civil proceeding was unreasonable.[9] The government does not dispute that the taxpayers substantially prevailed. Therefore, the only issue in dispute is whether the position of the United States in the civil proceeding was unreasonable. Third, the taxpayers must show that

the amount they have requested for attorney's fees is reasonable. Because the Tax Court denied taxpayers' motion without considering this requirement, this issue is not before this court.

There are two other important matters upon which the parties are in agreement. First, all acknowledge that the taxpayers have the burden of establishing the unreasonableness of the government's position. *See Harrison v. Commissioner*, 854 F.2d at 265. Second, the parties also agree that the Commissioner's failure to prevail in the underlying litigation does not require a determination that his position was unreasonable. *See Huckaby v. United States Dep't of Treasury*, 804 F.2d 297, 299 (5th Cir. 1986).

### 2.

Since our task is to review the judgment of the Tax Court under an abuse of discretion standard, we must focus, within the analytical framework just described, on the reasons given by that court for its determination that the Commissioner's position was not unreasonable. Because that court's explanation is indeed central to our

---

832 F.2d 1057, 1060 (8th Cir.1987)). This statement is hardly sufficient to place in issue the administrative posture of the Commissioner, even if we were to assume, *arguendo*, that the Tax Court had misconstrued the tenor of the taxpayers' argument. We have noted on numerous occasions that it is the responsibility of the appellant to present to this court reasoned argument, including citation of authority, on each point tendered for consideration by the court. An appellant is required by Rule 28(a)(4) of the Federal Rules of Appellate Procedure to present in its brief to the appellate court the issues that it desires to litigate and to support its arguments on those issues with appropriate judicial authority. *See Zelazny v. Lyng*, 853 F.2d 540, 542 n. 1 (7th Cir.1988); *Sere v. Board of Trustees of Univ. of Illinois*, 852 F.2d 285, 287–88 (7th Cir.1988); *United States v. Shriver*, 842 F.2d 968, 972 n. 5 (7th Cir.1988); *Beard v. Whitley County REMC*, 840 F.2d 405, 408 (7th Cir.1988). "'It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.'" *Beard*, 840 F.2d at 408–09 (quoting *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir.1986), *cert. denied*, 479 U.S. 1056, 107 S.Ct. 933, 93 L.Ed.2d 984 (1987)). At oral argument, the administrative history of the case was again presented. However, like our colleague in the Tax Court,

we construe that presentation as designed to illustrate the unreasonableness of the *legal* position taken by the Commissioner with respect to the tax liability of the taxpayers. Moreover, a litigant may not raise new arguments during oral argument. *See, e.g., Dovenmuehle v. Gilldorn Mortgage Midwest Corp.*, 871 F.2d 697, 701 n. 5 (7th Cir.1989); *Lim v. Central DuPage Hosp.*, 871 F.2d 644, 648 (7th Cir.1989) ("oral argument in this court ... [is] too late for advancing new (or what is the same thing, reviving abandoned)" arguments). Of course, the *legal* position of the Commissioner—that notice of the election to discontinue Subchapter S status must be reported to the IRS—has remained the same throughout the administrative and judicial proceedings.

9. This language was altered by the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085, 2752, which was approved October 22, 1986, to require that a taxpayer must "establish[ ] that the position of the United States in the civil proceeding was not substantially justified." Section 7430 was amended again in 1988 and the current version is codified at 26 U.S.C. § 7430(c)(4)(A). Because this action was filed September 4, 1984, before the amendment became effective, the unamended language is applicable.

review—and review under an abuse of discretion standard, while deferential, must still be a meaningful review [10]—we do, of course, welcome, and indeed expect, a trial court to provide a reasoned explanation for its result. In this case, the Tax Court's explanation is indeed terse. However, it is obvious that the trial judge intended that it be read together with the opinion in the underlying deficiency litigation. Therefore, we shall examine the opinions together.

As the Tax Court noted, the Commissioner's position was formulated at a time when the revised version of section 1372(e)(1) had not yet been interpreted by any court. The statutory language—read without reference to the regulations that the Secretary was mandated to provide but did not provide—gives incomplete directions with respect to the manner in which the affirmative refusal to consent is to be made. The Commissioner took the position that, despite the absence of regulations, the taxpayers were required to notify formally the IRS of their refusal to consent within sixty days. In rejecting this position, the Tax Court noted that the plain wording of the statute did not require such a filing:

> Congress, in adopting the words contained in section 1372(e)(1), did not preclude the Secretary from prescribing a method other than one which requires new shareholders to file an affirmative refusal to consent with the Service. Therefore, we hold that the plain mean-

ing of the relevant language under section 1372(e)(1) does not require a new shareholder to file an affirmative refusal to consent with the Service.

89 T.C. at 363 (footnote omitted). The court then examined whether, despite the absence of such an affirmative mandate in the statute, it would be contrary to the legislative purpose not to require such a filing with the IRS. The plain wording of the statute, said the court, may only be overridden by *unequivocal* evidence that "Congress intended that section 1372(e)(1) would, by that section's own terms, and without any regulatory requirement, require the filing of an affirmative refusal to consent with the Service." 89 T.C. at 364. The court then embarked upon a comparison of the previous statutory and regulatory scheme [11] with the new scheme.[12] It noted that the legislative history, while it spoke in several places of filing with the IRS, did not *unequivocally* manifest a congressional intent to require such a filing in the absence of regulations. Therefore, the court concluded:

> Based upon the sparse legislative history underlying section 1372(e)(1) and the General Explanation, we are not prepared to find that Congress was attempting to require by *statute* that new shareholders file affirmative refusals to consent with the Service, and thereby preclude the Secretary from prescribing some other manner for new shareholders to affirmatively refuse to consent under section 1372(e)(1). We therefore hold

---

**10.** *See In re Ronco, Inc.*, 838 F.2d 212, 217 (7th Cir.1988) ("Review under the abuse of discretion standard does not mean no appellate review.").

**11.** The court explained the earlier scheme as follows:

> For taxable years beginning before January 1, 1977, section 1372(e)(1) required new shareholders in a corporation to consent to a corporation's subchapter S election under section 1372(a) within the period of time prescribed by the Secretary in order to avoid a termination of the corporation's election. Sec. 1.1372–3(b), Income Tax Regs., required that the consent "be made in a statement filed (with the internal revenue officer with whom the election is filed) within the period of 30 days beginning with the day on which such

person becomes a new shareholder." The Commissioner granted extensions of time for filing consents if "there was reasonable cause for the failure to file" the consents, and certain other conditions were satisfied. Sec. 1.1372–3(c), Income Tax Regs.

89 T.C. at 364–65 (footnotes omitted).

**12.** With respect to the new scheme, the Tax Court wrote:

> As part of the Tax Reform Act of 1976, Congress changed the statutory consent requirement to a statutory affirmative refusal to consent requirement and changed the 30–day regulatory period for filing the consent with the Service to a 60–day statutory period for making an affirmative refusal. Sec. 902(c)(3), Tax Reform Act of 1976, 90 Stat. 1609.

89 T.C. at 365.

that the plain meaning of the statutory language contained in section 1372(e)(1) is not "plainly at variance with the policy of the legislation as a whole." Thus, we follow the statute's literal words, which do not require that an affirmative refusal to consent be filed with the Service in order to terminate a subchapter S election.

89 T.C. at 367.

■ We agree with the Tax Court that its conclusion in the underlying litigation "involved a complex analysis of section 1372(e)(1) and that section's legislative history, as well as the regulations underlying section 1372(e)(1)." Mem. sur order at 6. We also agree that the Commissioner's position with regard to that legislative change can hardly be termed "unreasonable"—despite his failure to provide "unequivocal" evidence of a legislative understanding not plainly evident from the text of the statute. The basic thrust of the 1976 legislative change was to alter *what* had to be reported. Under the prior law, Subchapter S status had been inadvertently lost through the failure of new shareholders to consent affirmatively to its continuation. To avoid that injustice, under the new scheme, only refusals to continue had to be reported. However, Congress' decision to change *what* had to be reported in order to abolish a specific pitfall does not indicate necessarily that Congress also had determined to excuse *all* notification to the Commissioner. Information on the status of the corporate entity and the time of its election of that status are important to the administration of the tax laws. *See, e.g., Frentz v. Commissioner*, 375 F.2d 662 (6th Cir.1967) (requiring strict compliance with Subchapter S election requirements). The Commissioner cannot be said to have acted unreasonably in assuming that, just because Congress addressed the question of *what* had to be filed, Congress was also abolishing so important a tool in tax enforcement as notification to the IRS. Indeed, the legislative history can be read—although not unequivocally read—as assuming that such notification would be given. *See Zinniel*, 89 T.C. at 366 (noting that the General Explanation contains several references to filing).

On this basis, we cannot disturb the Tax Court's determination that the Commissioner's position, while erroneous, was not unreasonable. It is therefore unnecessary for us to deal extensively with the other arguments of the taxpayers which do not affect this fundamental conclusion of the Tax Court. Accordingly, the judgment of the Tax Court is affirmed.

AFFIRMED

WILL, Senior District Judge, dissenting.

While I agree with the majority that the proper standard of review under 26 U.S.C. § 7430 is an abuse of discretion standard, I believe the Tax Court's decision in this case that the Commissioner's position was not unreasonable is incorrect and an abuse of discretion.

The Commissioner's conduct in this proceeding was anything but reasonable. In the October 4, 1976 amendments to 26 U.S.C. § 1372(e)(1) Congress specifically directed the Commissioner to promulgate regulations to prescribe the manner in which a new shareholder of a subchapter S corporation would "affirmatively refuse[] ... to consent to such [subchapter S corporation] election...." Pub.L. No. 94-455, § 902(c)(3), 90 Stat. 1520, 1609 (1976). It is undisputed that the Commissioner had not prescribed such regulations by the time a year later, in November 1977, that the petitioners sought to change the status of their subchapter S corporation. On November 30, 1977, three new shareholders filed a Refusal to Consent to Small Business Corporation Election with the corporation. It was not until April 17, 1980, nearly two and one-half years later, and approximately three and one-half years after Congress directed that regulations be issued, that the Commissioner even promulgated *proposed regulations.* As the majority correctly points out, at 1353 (citing the Tax Court), proposed regulations are not binding and, in any event, these were issued long after the petitioners' actions in this case.

Notwithstanding the fact that the Commissioner had not timely prescribed the manner by which new shareholders would be required affirmatively to refuse to consent, the IRS was given early and ample notice that such an affirmative refusal to consent had been made here. On November 30, 1977, the same date the refusal to consent was filed with the corporation, the corporation's officers filed an Application For Determination For Defined Contribution Plan (a Form 5301) with the Commissioner reflecting, that for federal tax purposes, Sierra Ltd. was a general corporation, not a subchapter S corporation. Because the IRS knew that Sierra Ltd. had previously been a subchapter S corporation, it also had to know that some action had been taken to convert it from a subchapter S corporation to a general corporation. Thereafter, on February 23, 1978, the Commissioner issued a favorable determination of the (new corporate status) contribution pension plan.

In June 1978, Sierra Ltd. filed its income tax return for the 1977–78 fiscal year, the year of the change in status. In its return, Sierra Ltd. reported the termination of its status as a subchapter S corporation. Attached to the June 1978 tax return was a letter stating the following:

Dear Sirs:

In accordance with the requirements of Regulation Section 1.1372–4(b)(1)(iii), this is to notify you of the termination of the election to be subject to Sub–Chapter S made by Sierra Limited, Post Office 247, North Prairie, Wisconsin 53153. The election was terminated by the failure of new shareholders to consent to the election within the required time. On November 30, 1977, Jane Merryfield, Margaret Samuels and Gayle Zinniel each acquired thirty shares of Sierra Limited. They subsequently failed to consent to the election to treat Sierra Limited as a Sub–Chapter S corporation.

SIERRA LIMITED

BY: _____

John C. Zinniel, Agent

The document reflecting the refusal to consent ("Refusal to Consent to Small Business Corporation Election") was not attached to Sierra's June 1978 tax return. However, on December 28, 1978, pursuant to a request from the IRS, Sierra's accountant filed a copy of the refusal to consent. It was not until June 6, 1984, six years after the return was filed and five and one-half years after the refusal to consent was filed with the IRS, that the Commissioner decided to issue a notice of deficiency with respect to the years 1978 and 1979, claiming, without any case authority or applicable regulations, that the petitioners' attempted affirmative refusal was ineffective because the signed document indicating a refusal to consent had not been timely submitted to the IRS.

The unreasonableness of the IRS' position is further evidenced by a comparison between section 1372 prior to the 1976 amendment and section 1372 as amended in 1976. Section 1372(e)(1)(A) was amended in 1976, effective for the tax years in question, to require that new shareholders affirmatively refuse to consent to a subchapter S election in order to terminate such election. Previously, there was no requirement for new shareholders to act in order to terminate the subchapter S status. Instead, a new shareholder had to consent to the status by filing a consent with the IRS in order to maintain the status. This created a problem in that taxpayers were inadvertently terminating their corporation's subchapter S status by failing to file their consent. Thus, under the old law the petitioners here would have effectively terminated their subchapter S corporation status by doing nothing.

By amending section 1372, Congress attempted to prevent unintentional terminations of subchapter S corporation status. The amendment mandated that the Commissioner promulgate regulations prescribing how such an affirmative refusal was to be made. It is undisputed that at the time the petitioners elected to change their corporate status, and for more than three years thereafter, the Commissioner had not promulgated any regulations or revenue procedures or issued any letter rulings.

Ironically, had the Commissioner prevailed before the Tax Court, it would have to have been because the failure to promulgate regulations "inadvertently" prevented the petitioners from properly changing the status of Sierra Ltd., a truly ironic result.

Indeed, the Commissioner's position before the Tax Court was that the petitioners had failed effectively to terminate their subchapter S corporate status because they did not send their affirmative refusal to the IRS although, as the Tax Court held, the plain language of the statute (in the absence of any regulations prescribed by the Commissioner) did not require such action. While the Commissioner's long delay in prescribing such regulations may sometimes be excusable, it is difficult to believe that not even issuing a ruling or temporary regulations was reasonable in this case. Even worse, it was not reasonable for the Commissioner thereafter to contend that taxpayers failed to comply with regulations which had not yet been promulgated, particularly when the IRS had all the information it would have obtained under the regulations as ultimately promulgated. As previously indicated, a copy of the refusal to consent was filed with the IRS in December 1978, more than a year before proposed regulations were issued and five and one-half years before the deficiency was asserted.

While the majority acknowledges, at 1352 n. 5, that the petitioners attempted in good faith to comply with whatever procedures were necessary, it apparently attaches little or no significance to their efforts. Their tax attorney sought advice from the Milwaukee District Director's office on November 11, 1977 with respect to the new method for termination of subchapter S corporations and was advised that no information was available and that he should communicate with the District Director. The taxpayers' attorney wrote to the District Director on November 15, 1977 and was called in response by an office representative who indicated that no regulations had yet been promulgated. The Commissioner's failure to issue regulations as mandated by Congress, or even a ruling, clearly contributed to the taxpayers' dilemma.

Terminating a subchapter S corporate status, it should be noted, is within the shareholders' discretion. The Commissioner does not approve or disapprove of this action. Thus, there was no harm to the Commissioner and, as noted previously, the IRS had effective notice of the petitioners' refusal to consent as early as November 30, 1977.

The Commissioner correctly points out that his position during this litigation was not contrary to any case law. There were no reported cases with respect to an alleged improper refusal to consent under section 1372. However, the Commissioner cannot escape liability under section 7430 for unreasonable conduct simply because a statute is new and its application untested. Indeed, the purpose of section 7430 is to "deter abusive actions and overreaching by the Internal Revenue Service and ... enable individual taxpayers to vindicate their rights regardless of their economic circumstances." *In re The Testimony of Arthur Andersen & Co.*, 832 F.2d 1057, 1060 (8th Cir.1987) (citing *Kaufman v. Egger*, 584 F.Supp. 872, 879 (D.Me.1984). The Commissioner's conduct here in failing to issue regulations and then seeking to assess deficiencies for failure to comply with them before they were issued was abusive and overreaching.

The Tax Court's decision in the underlying litigation confirms the unreasonableness of the Commissioner's position.

[W]e fail to understand how the Secretary could fail to issue any temporary or final regulations prescribing the procedures for new shareholders to affirmatively refuse to consent to subchapter S elections when there was a statutory direction to issue such regulations (the statute required that the new shareholders affirmatively refuse to consent "in such manner as the Secretary *shall* by regulations prescribe") (Emphasis supplied.) Furthermore, in light of the prior regulatory requirement under section 1.1372–3, Income Tax Regs., that new shareholders file consents to the continu-

ation of subchapter S elections with the Service, it does not appear that it would have been difficult to issue temporary regulations prescribing similar filing requirements for new shareholders to affirmatively refuse to consent. Finally, if the Commissioner and the Secretary deemed a filing requirement to be crucial to their ability to administer section 1372(e)(1), they should have issued temporary or final regulations prescribing the requirement. It is obvious that the amendment of section 1372(e)(1) was an attempt by Congress to remove a trap for the unwary, i.e., an inadvertent termination of a subchapter S election. The failure to issue temporary or final regulations under the new statutory section frustrated that purpose by creating a new trap, i.e., an inadvertent failure to terminate a subchapter S election.

*Zinniel v. Commissioner*, 89 T.C. 357, 369–70 (1987) (footnotes omitted).

The Commissioner contends that it was reasonable for the taxpayers to expect to have to file their affirmative refusals with the IRS because otherwise the IRS would not be sure that the corporation had made a timely election. While there may be some merit to this argument in general, it is not persuasive in this case. This transaction was not done in any way to conceal the action from the IRS and had there been an IRS regulation in place which required a filing with the IRS, there is no evidence suggesting that it would have been done. Moreover, the IRS had all the information it would have received under the regulations, since a copy of the refusal was filed in December 1978.

As I have previously noted, the taxpayers' attorney inquired of the IRS at least twice as to what steps were necessary—they were ready to comply. The new shareholders filed a notice of refusal with the company. The company attached a letter with its next tax return indicating that this had been done. As soon as requested, and long before even proposed regulations were issued, it filed a copy of the Refusal to Consent with the IRS. Even before that, the company filed for approval of a qualified pension plan (which it could not have done under subchapter S) and received approval of the plan from the Commissioner.

Section 7430 does not define what is unreasonable but the legislative history suggests that the Commissioner's conduct is to be reviewed in light of the then prevailing law and regulations, in addition to the particular facts of the case. H.R.Rep. No. 97–404, 97th Cong., 1st Sess. 12 (1981); *Arthur Andersen*, 832 F.2d at 1060. It is intended to deter exactly the kind of unreasonable and inexcusable conduct engaged in by the IRS here. The taxpayers have been put to considerable effort and expense to defend against a deficiency which, as the Tax Court found, should never have been asserted. They should at least be reimbursed for their expenses in doing so.

The Tax Court's decision that the Commissioner's conduct was not unreasonable, since the case was complex and one of first impression and because the Commissioner was attempting to enforce the tax laws is, I believe, clearly an abuse of discretion. The Commissioner's failure to prescribe regulations was unreasonable. To later attempt to recover a deficiency from the petitioners based on a statute which did not require them to do anything they failed to do, particularly when the IRS had all the information it would have obtained under the regulations as finally promulgated was, to put it mildly, likewise unreasonable and abusive. Section 7430 was enacted to keep from putting taxpayers through such an unjustified and expensive experience and to compensate taxpayers who are victims of such IRS conduct. Accordingly, I respectfully dissent from the majority's finding that the Tax Court did not abuse its discretion in holding the IRS and Commissioner's conduct in this case reasonable and section 7430 inapplicable.